FILED
United States Court of Appeals
Tenth Circuit

January 14, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RONALD CLINTON LOTT,

     Petitioner-Appellant,

v.

ANITA TRAMMELL, Interim
Warden, Oklahoma State Penitentiary,[*]

     Respondent-Appellee.

No. 11-6096

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:05-CV-00891-M)**

Randall Coyne, (Edna Asper Elkouri, Frank Elkouri, Professor of Law, University of Oklahoma College of Law, Norman, Oklahoma, and Lanita Henricksen of Henricksen & Henricksen Lawyers, Inc., Oklahoma City, Oklahoma, with him on the briefs), for Petitioner-Appellant.

Robert Whittaker, Assistant Attorney General (E. Scott Pruitt, Attorney General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.

Before **BRISCOE**, Chief Judge, **GORSUCH** and **HOLMES**, Circuit Judges.

**BRISCOE**, Chief Judge.

[*] Pursuant to Fed. R. App. P. 43(c)(2), Anita Trammel, who was appointed Interim Warden of Oklahoma State Penitentiary on September 24, 2012, is automatically substituted for Randall G. Workman as Respondent in this case.

This is a death penalty appeal involving two murders that were committed over twenty-five years ago. Petitioner Ronald Lott was convicted by an Oklahoma jury of two counts of first-degree murder in December 2001. The state trial court, in accordance with the jury's verdict, sentenced Lott to death on both counts in January 2002. After his direct appeal and application for state post-conviction relief were unsuccessful, Lott sought federal habeas relief by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied Lott's petition. Having been granted a certificate of appealability with respect to several issues, Lott now appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's denial of federal habeas relief.

I

*The Fowler and Cutler murders*

The basic facts of the murders committed by Lott were described by the Oklahoma Court of Criminal Appeals (OCCA) when ruling on Lott's direct appeal:

> Sometime after 10:30 p.m., September 2, 1986, Anna Laura Fowler was attacked in her home, raped and murdered. Mrs. Fowler was 83 years old and lived alone. As a result of the attack, Mrs. Fowler suffered severe contusions on her face, arms and legs, and multiple rib fractures. She died from asphyxiation.
> Zelma Cutler lived across the street from Mrs. Fowler. Mrs. Cutler was 93 years old and lived alone. During the early morning hours of January 11, 1987, Mrs. Cutler was attacked, raped and murdered in her home. Mrs. Cutler suffered severe contusions on her arms and legs as a result of the attack. She also suffered multiple rib fractures. Mrs. Cutler died from asphyxiation.

2

Lott v. State (Lott I), 98 P.3d 318, 327 (Okla. Crim. App. 2004) (internal

paragraph numbers omitted).

The OCCA's description, although accurate, fails to convey fully the brutal

nature of the rapes and murders. In both instances, the victims were vaginally

raped and orally sodomized. Further, the evidence presented at trial suggested

that Fowler was anally raped and that the perpetrator attempted to anally rape

Cutler as well. Lastly, the evidence presented at trial suggested that the rib

fractures sustained by Fowler and Cutler occurred as a result of the perpetrator

sitting directly on their chests and either orally sodomizing them and/or

suffocating them with pillows after the attack.

*Post-crime events leading to Lott's identification*

Notably, another individual, Robert Miller, was initially arrested, charged,

and convicted of the Fowler and Cutler murders. Id. But, notwithstanding

Miller's arrest, two additional elderly women living in the Oklahoma City area

were attacked and raped in their homes, in a manner similar to the attacks on

Fowler and Cutler. And Lott proved to be responsible for those crimes:

> Subsequent to Miller's arrest, Grace Marshall was attacked and raped
> in her home on March 22, 1987. Eleanor Hoster was attacked and
> raped in her home on May 7, 1987. Both Mrs. Marshall and Mrs.
> Hoster were elderly ladies who lived alone. With the exception that
> Mrs. Marshall and Mrs. Hoster were not killed after being raped,
> there were striking similarities between the attacks on the four
> women. [Lott] was arrested, charged, and ultimately plead [sic]
> guilty to committing the rapes against Mrs. Marshall and Mrs.
> Hoster.

3

Id.

In the early 1990s, DNA testing established that Lott, rather than Miller, had raped Fowler and Cutler. Id. At that time, Lott was still incarcerated and serving time in connection with the Marshall and Hoster rape convictions.

*The state trial proceedings*

On March 10, 1995, an amended information was filed in the District Court of Oklahoma County, Oklahoma, Case No. CF-87-963, jointly charging Lott and Miller with two counts of first-degree malice aforethought murder (Count 1 was for the murder of Fowler and Count 2 was for the murder of Cutler) and, in the alternative, with two counts of first-degree felony murder. On January 30, 1996, however, those charges were dismissed at the request of the State.

On or about March 19, 1997, the State reinstated the case by filing a third amended information against Lott and Miller. The trial court appointed the Oklahoma Indigent Defense System (OIDS) to represent Lott.

On March 20, 1998, the State filed a bill of particulars asserting that Lott "should be punished by death . . . due to and as a result of" the existence of three "aggravating circumstance(s)": (1) the murders were "especially heinous, atrocious, or cruel"; (2) the murders were "committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; and (3) "[t]he existence of a probability that [Lott] would commit criminal acts of violence that would constitute a continuing threat to society." State R., Vol. II, at 249.

4

On November 13, 2000, the State filed a fourth amended information. Although the fourth amended information continued to charge Lott with two counts of first-degree malice aforethought murder and, in the alternative, two counts of first-degree felony murder, the charging language differed significantly from that of the third amended information. Whereas the third amended information alleged that the first-degree malice aforethought murder counts, as well as the felony murder counts, were "feloniously committed . . . by Robert Lee Miller Jr. and Ronald Clinton Lott . . . acting jointly [and] willfully," id., Vol. I, at 47, the fourth amended information (a) omitted from the first-degree malice aforethought murder charges the allegations that Lott acted jointly with Miller, thus leaving only Lott as the named defendant in those counts, and (b) altered the felony murder counts to allege that Lott was "aided and abetted by . . . Miller." Id., Vol. IV, at 735.

> The case proceeded to trial on October 29, 2001. But a mistrial occurred:
>
> In the middle of trial, the State requested a continuance when the medical examiner revealed he had evidence in his possession that had never been tested. The State requested the continuance so LabCorp could test the newly discovered evidence. The defense requested a mistrial. The State agreed to the mistrial if the defense would agree to stipulate to a continuance and stipulate to the chain of custody. The mistrial was granted and the trial rescheduled for December 3, 2001.

Lott I, 98 P.3d at 328 n.3.

> The December 2001 trial proceeded as scheduled. At the conclusion of the

first-stage evidence, the jury found Lott guilty of both murders. At the conclusion of the second-stage proceedings, the jury found, with respect to each of the counts of conviction, the existence of two of the three alleged aggravating circumstances: that the murders were especially heinous, atrocious, or cruel, and that the murders were committed for the purpose of avoiding or preventing a lawful arrest or prosecution. The jury in turn fixed Lott's punishment at death for each of the two counts of conviction.

On January 18, 2002, the state trial court formally sentenced Lott to death for each of the two murder convictions. Judgment in the case was entered that same day.

*Lott's direct appeal*

Lott filed a direct appeal asserting seventeen propositions of error. On September 9, 2004, the OCCA issued a published opinion affirming Lott's convictions and death sentences.

Lott filed a petition for writ of certiorari with the United States Supreme Court, but his petition was denied on March 28, 2005. Lott v. Oklahoma, 544 U.S. 950 (2005).

*Lott's application for state post-conviction relief*

On August 9, 2004, Lott filed with the OCCA an application for post-conviction relief, as well as a motion for an evidentiary hearing and discovery. On November 22, 2004, the OCCA issued an opinion denying Lott's application

6

for post-conviction relief and his motion for an evidentiary hearing and discovery.

*Lott's federal habeas proceedings*

Lott initiated these federal habeas proceedings on August 4, 2005, by filing a petition for writ of habeas corpus, as well as motions for appointment of counsel and to proceed in forma pauperis. The district court granted Lott's motion for appointment of counsel. On February 17, 2006, Lott's appointed counsel filed a petition on Lott's behalf asserting twenty-two grounds for relief.

On March 31, 2011, the district court issued a memorandum opinion denying Lott's petition. The district court entered judgment in the case that same day, and also issued an order granting Lott a certificate of appealability (COA) with respect to seven of the twenty-two grounds raised in his petition.

On April 7, 2011, Lott filed a notice of appeal. We subsequently granted Lott a COA as to three additional issues. Lott has since filed an appellate brief asserting a total of eight propositions of error.

II

*Standards of review*

Our review of Lott's appeal is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts. Id. As a result, our focus here is upon the rulings of the

7

OCCA, not those of the federal district court.

If a claim was addressed on the merits by the state courts, we may not grant federal habeas relief on the basis of that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal quotation marks and citation omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching. That is, because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. McLuckie, 337 F.3d at 1197.

8

III

*Analysis*

**1) Speedy trial claim**

In Proposition One of his appellate brief, Lott contends that the state trial court violated his Sixth Amendment rights by denying his motions to dismiss the criminal proceedings on speedy trial grounds.

*a) Clearly established Supreme Court precedent*

Lott points to the Supreme Court's decision in <u>Klopfer v. North Carolina</u>, 386 U.S. 213 (1967), as providing the clearly established federal law applicable to his claim. In <u>Klopfer</u>, the Supreme Court held "that the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment," 386 U.S. at 223, and that, consequently, the Sixth Amendment right to a speedy trial[1] "is to be enforced against the States under the Fourteenth Amendment." <u>Id.</u> at 222 (internal quotation marks omitted). The Court in <u>Klopfer</u> also addressed a unique aspect of North Carolina criminal procedure, under which "the prosecuting attorney of a county, denominated the solicitor, . . . may take a <u>nolle prosequi</u>" "if he does not desire to proceed further with a prosecution." <u>Id.</u> at 214. Notably, "the taking of [a] <u>nolle prosequi</u> does not permanently terminate proceedings on the indictment." <u>Id.</u> Instead, the Court noted, "the case may be restored to the trial docket when

_____

[1] The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI.

9

ordered by the judge upon the solicitor's application," and "if the solicitor petitions the court to nolle prosequi the case 'with leave,' the consent required to reinstate the prosecution at a future date is implied in the order and the solicitor (without further order) may have the case restored for trial." Id. (internal quotation marks omitted). Because "the indictment is not discharged by either a nolle prosequi or a nolle prosequi with leave, the statute of limitations remains tolled." Id. "The consequence of this extraordinary criminal procedure," the Court noted, is that "[a] defendant indicted for a [crime] may be denied an opportunity to exonerate himself in the discretion of the solicitor and held subject to trial, over his objection, throughout the unlimited period in which the solicitor may restore the case to the calendar." Id. at 216. Ultimately, the Court held that this procedure denies a criminal defendant "the right to a speedy trial . . . guaranteed to him by the Sixth Amendment." Id. at 222.

Lott also relies on the Supreme Court's decisions in United States v. MacDonald, 456 U.S. 1 (1982), and Barker v. Wingo, 407 U.S. 514 (1972). In MacDonald, the Court noted the general contours of the Sixth Amendment right to a speedy trial: "no Sixth Amendment right to a speedy trial arises until charges are pending," and "the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges." 456 U.S. at 7. In turn, the Court noted that the purpose of "[t]he Sixth Amendment right to a speedy trial is . . . not . . . to prevent prejudice to the defense caused by passage

10

of time," but rather "to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." Id. at 8.

In Barker, the Court adopted a "balancing test" for purposes of determining whether a criminal defendant's Sixth Amendment right to a speedy trial has been violated. 407 U.S. at 530. Four factors are relevant under that balancing test: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. "The length of the delay," the Court noted, "is to some extent a triggering mechanism" because "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." Id. "Nevertheless," the Court stated, "the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case," including, for example, the seriousness and complexity of the pending charges. Id. at 530-31. "Closely related to length of delay," the Court noted, "is the reason the government assigns to justify the delay," and "different weights should be assigned to different reasons." Id. at 531. "[T]he third factor, the defendant's responsibility to assert his right, . . . is closely related to the other [three] factors." Id. "The defendant's assertion of his speedy trial right," the Court stated, "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." Id. at 531-32.

11

The fourth factor, prejudice to the defendant, "should be assessed," the Court held, "in the light of the interests of defendants which the speedy trial right was designed to protect," i.e., "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Id. at 532. The Court emphasized that "[o]f these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id. "In sum," the Court held, "none of the four factors [is] . . . either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." Id. at 533. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." Id.

   b) *The OCCA's rejection of Lott's claim*

Lott asserted his speedy trial claim on direct appeal, "claim[ing that] all four [Barker] factors clearly weigh[ed] in his favor and that his speedy trial right ha[d] been unquestionably denied." Lott I, 98 P.3d at 327. The OCCA agreed that "the length of delay" between the filing of the third amended information and the date of trial, which it calculated to be "approximately 4 years and 10 months," "was . . . substantial . . . and . . . sufficient . . . to necessitate a review of the other three [Barker] factors." Id. at 328. Although the OCCA agreed that the first and third Barker factors (length of the delay and assertion of the right by the accused) "weigh[ed] in [Lott]'s favor," it concluded that the remaining two Barker factors

12

(reasons for the delay and prejudice) "favor[ed] the State." Id. at 333. And the OCCA ultimately concluded that Lott "was not deprived of his speedy trial rights . . . , based upon the finding of reasonable reasons for the delay, the absence of significant prejudice, and the less-than egregious deprivation of liberty." Id.

### c) Lott's challenges to the OCCA's decision

In this federal habeas appeal, Lott focuses much of his attention on what he perceives as flaws in the district court's analysis of the Barker factors, rather than focusing exclusively on the OCCA's analysis of those factors. Because, however, the OCCA resolved the speedy trial claim on the merits, § 2254(d) requires us to focus exclusively on the OCCA's analysis of the claim. Accordingly, we shall give Lott the benefit of treating his arguments as challenges to the OCCA's decision, rather than the district court's decision.

### 1) Length of the delay

Lott argues that, with respect to the first Barker factor, i.e., length of the delay, "the day he was first charged [with the Fowler and Cutler murders], March 10, 1995, is the appropriate start date for assessing his speedy trial date." Aplt. Br. at 30. Consequently, he asserts, "[t]he length of delay between that date and the start of trial was six years and eight months." Id. In support, Lott asserts that the prosecution "did not act in good faith" in dismissing the original charges and refiling them. Id. at 31. And, he argues, his "situation is virtually identical to the facts of [Klopfer]." Id. at 33.

The OCCA concluded that Lott's "reliance on <u>Klopfer</u> . . . [wa]s misplaced." <u>Lott I</u>, 98 P.3d at 328. Specifically, the OCCA noted that in <u>Klopfer</u>, "the prosecutor was able to suspend proceedings indefinitely" and "the charges were not dismissed," whereas in Lott's case, the original charges against Lott were dismissed entirely and Lott "was incarcerated for a separate crime at the time [of the dismissal]." <u>Id.</u>

The OCCA's holding in this regard is neither contrary to, nor an unreasonable application of, <u>Klopfer</u>. In all key respects, Lott's case differs from <u>Klopfer</u>. Most importantly, unlike <u>Klopfer</u>, the original charges against Lott were dismissed rather than simply suspended, and thus Lott did not remain "subject to trial" during the time period between the dismissal of the charges on January 30, 1996, and the filing of the third amended information on March 19, 1997. <u>Klopfer</u>, 386 U.S. at 216.

### 2) Reasons for the delay

Lott contends that the OCCA unreasonably applied <u>Barker</u> in concluding that the reasons for the delay "w[ere] not solely attributable to the State," and that "the majority of the delays were necessary to further the ends of justice and ensure that [Lott] received a fair and impartial trial." <u>Lott I</u>, 98 P.3d at 331. In support, Lott "asserts that the record reveals ample evidence of deliberate delay by the State." Aplt. Br. at 34. Most notably, Lott asserts, was "[t]he conduct of Judge Owens, the original trial judge." <u>Id.</u> at 36. Lott argues that "[a]lthough

14

Judge Owens presided over the case from March 20, 1998 until he retired in January of 1999, he did next to nothing to advance . . . Lott's speedy trial interests." Id. at 36-37. Lott asserts that only once during the nine months that Judge Owens presided over the case did Lott or his counsel appear before the court, and on that occasion (May 1, 1998), "Judge Owens continued the [matter]." Id. at 37. Lott argues that "[t]he record and circumstances strongly suggest that Judge Owens was well aware, long before January of 1999, that he intended to retire," and "he obviously decided early on that he would not take any steps to move the case along." Id. In short, Lott argues, Judge Owens engaged in "purposeful conduct," i.e., delay, "designed to thwart . . . Lott's fundamental constitutional rights." Id.

But the OCCA, citing the state trial court's factual findings (made in connection with its denial of Lott's motion to dismiss on speedy trial grounds), rejected these same arguments:

> In this regard, the trial court found[, after conducting an evidentiary hearing,] the case was delayed due to scheduling conflicts of both court and counsel. The trial court found that the docket of Judge Owens was such that he could not have tried a case of this magnitude during the four month time period encompassing the final completion of the preliminary hearing transcript and the date of his retirement. The trial court noted that Judge Owens chose not to hear any pre-trial motions in this case as he would not be the presiding judge at trial. The trial court found no defense request for trial during the time the case was pending before Judge Owens.
> Section 812.2(A)(2)(g) and (i) [of the Oklahoma statutes] require the court to look at whether the delay occurred because "the court has other cases pending for trial that are for persons incarcerated

15

prior to the case in question, and the court does not have sufficient time to commence the trial of the case within the time limitation fixed for trial," and "the court, state, accused, or the attorney for the accused is incapable of proceeding to trial due to illness or other reason and it is unreasonable to reassign the case." While we do not know from the record whether Judge Owens had other cases pending for trial that were for persons incarcerated longer than Appellant, we do have the trial court's finding that Judge Owens' docket was such that he could not try a case of this complexity prior to his retirement. While these delays appear to be a deliberate postponement of the case, taking judicial notice of the large caseload of criminal cases in the District Court of Oklahoma County, and the complex nature of the present case, we do not dispute the trial court's finding that the delay pending Judge Owens' retirement was reasonable. Therefore, this delay does not weigh in Appellant's favor.

Lott I, 98 P.3d at 329 (footnote and internal paragraph numbers omitted).

Lott does not seriously dispute any of the above-referenced factual findings that were made by the state trial court and relied on by the OCCA. For example, Lott does not dispute, and the record confirms, that at no time while Judge Owens was presiding over the case did defense counsel request a trial or assert that Lott's speedy trial rights were being violated. As for the state trial court's findings regarding Judge Owens' docket, there is simply no evidence in the record to either confirm or dispute those findings. Because the burden rests on Lott to establish that the OCCA's analysis was "based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), he has failed in this regard.

Lott next takes issue with the OCCA's determination that the state trial court's decision to grant two continuances requested by the State in order to conduct mitochondrial DNA testing "were reasonable and prudent." Lott I, 98

16

P.3d at 330.  According to Lott, "scientific advances are commonplace and as a matter of public policy should not be permitted as justification for delaying justice or denying constitutional rights."  Aplt. Br. at 38.  And, Lott argues, "the State's wrongful and nearly fatal prosecution and conviction of one innocent man[, Miller,] should not be accepted as justification for discarding the constitutional rights of another man presumed innocent."  Id.

Lott's arguments, however, do nothing to establish that the OCCA's determination was an unreasonable application of clearly established federal law.  In Barker, the Supreme Court expressly recognized that, in assessing "the reason the government assigns to justify [a particular] delay," "different weights should be assigned to different reasons."  407 U.S. at 531.  Given the unusual background of this case, specifically the erroneous conviction of Miller, and the serious nature of the potential punishment, the OCCA concluded, and we cannot dispute, that it was entirely reasonable for the state trial court to have allowed the State sufficient time to analyze the forensic evidence.  In turn, the OCCA's classification of the State's conduct as "reasonable and prudent" was neither contrary to, nor an unreasonable application of, Barker.[2]

Lastly, Lott contends that it was unreasonable for the OCCA to conclude

_____

[2] As the OCCA correctly noted, "all of the evidence had been gathered, [and] no new evidence was sought" by the prosecution.  Lott I, 98 P.3d at 332.  Thus, "[i]t was merely a question of analyzing that evidence in the most accurate method possible."  Id.  Further, "[s]uch testing could have very easily been exculpatory and therefore benefited [Lott]."  Id.

17

that the delay from June 2, 2000, when Lott's motion to dismiss on speedy trial grounds was denied by the state trial court, to November 13, 2000, the rescheduled trial date set by the state trial court (which included time to allow Lott to seek mandamus relief from the OCCA) "d[id] not weigh in [Lott]'s favor as [the mandamus action] was ultimately unsuccessful." Lott I, 98 P.3d at 330. In support, Lott argues that "[s]eeking a remedy for a colorable constitutional violation is a valid reason, particularly since had [his] speedy trial rights been vindicated by the OCCA, his mandamus action would have spared the State the considerable time and expense it took to try and convict him." Aplt. Br. at 39. In short, he argues, "[i]t is patently unfair to tax [him] for promptly and zealously seeking to vindicate his constitutional rights." Id.

We reject Lott's arguments. In reaching its conclusion, the OCCA relied in part on the Supreme Court's decision in United States v. Loud Hawk, 474 U.S. 302 (1986). In Loud Hawk, the Supreme Court considered how, under the Barker test, "to weigh the delay occasioned by an interlocutory appeal when the defendant is subject to indictment or restraint." Id. at 312. The Court concluded, in pertinent part, that "[i]n that limited class of cases where a pretrial appeal by the defendant is appropriate, delays from such an appeal ordinarily will not weigh in favor of a defendant's speedy trial claims." Id. at 316 (citation omitted). The Court noted that "[a] defendant who resorts to an interlocutory appeal normally should not be able upon return to the district court to reap the reward of dismissal

18

for failure to receive a speedy trial." Id. Although Lott now attempts to distinguish his case from Loud Hawk, arguing that he filed a mandamus action rather than an interlocutory appeal, and that the speedy trial claim he asserted was not meritless, the OCCA reasonably relied on Loud Hawk in concluding that the delay associated with the mandamus action did not weigh in Lott's favor. Indeed, the critical holding in Loud Hawk, quoted above, was not contingent upon the procedural vehicle used by a criminal defendant to appeal, or upon the meritoriousness of the arguments asserted by the defendant.

### 3) Assertion of the speedy trial right

Lott argues that the OCCA, although weighing the third Barker factor in his favor, "miscalculated the number of times [he] asserted [his speedy trial] right," and thus "failed to give this factor sufficient weight in performing the balancing required by Barker." Aplt. Br. at 40. In particular, Lott contends that the OCCA "failed to recognize at least three occasions on which [he] vigorously asserted his speedy trial rights." Id.

We reject Lott's arguments. To begin with, the OCCA did not make a definitive finding regarding the precise number of times that Lott asserted his speedy trial rights in the state trial court. Instead, it simply noted that he "made an affirmative request for a speedy trial on at least nine different occasions." Lott I, 98 P.3d at 331. Moreover, the OCCA noted that the third Barker factor was satisfied because Lott was incarcerated while awaiting trial. Id. ("As for the third

19

factor, . . . incarceration makes the demand for one in custody."). And, most importantly, the OCCA expressly indicated that Lott's assertion of his speedy trial right was "entitled to strong evidentiary weight in determining whether [he] [wa]s . . . deprived of the right." Id. (internal quotation marks omitted). Thus, there is no basis for concluding that the OCCA's analysis was unreasonable, or that the outcome of its Barker analysis would have been different had it taken into account additional instances of Lott asserting his speedy trial rights. Again, Lott prevailed on this point. The OCCA concluded Lott had affirmatively asserted his speedy trial rights and weighed that Barker factor in Lott's favor.

*4) Prejudice*

Lott contends that the OCCA unreasonably analyzed and applied the fourth Barker factor, prejudice. Lott suggests, as an initial matter, that the length of the delay in his case (which he continues to argue should be considered to be six years and eight months), standing alone, should have been considered prejudicial. Aplt. Br. at 41-42. Lott further argues that he suffered actual prejudice due to the fact that, as a result of the DNA testing, the State was able to "address weaknesses in its case and shore up its prosecution." Id. at 42. Lastly, Lott contends that he also suffered prejudice because a potential defense witness, Janis Davis Lhyane, a forensic chemist who worked for the Oklahoma City Police Department, died prior to his trial. He explains:

Lott was prejudiced by . . . Lhyane's death because she had testified

20

at Robert Miller's trial that while conducting DNA testing on evidence from the Fowler crime scene she found a Caucasian hair. The hair which caused the contamination of the evidence turned out to be . . . Lhyane's hair. In addition, three other Caucasian hairs were found, and belonged neither to . . . Lhyane or . . . Fowler.

Id. at 43 (citations omitted).

The first and third of these arguments must be rejected because they were not presented to the OCCA in Lott's direct appeal. Specifically, nowhere in his direct appeal brief did Lott argue that the length of the delay, standing alone, was presumptively prejudicial, nor did he argue that he was prejudiced by Lhyane's death. See Direct Appeal Br. at 22-24. Consequently, the OCCA was not asked to, and thus did not, address these arguments. And we, in turn, cannot address the arguments because they are subject to an anticipatory procedural bar. See Anderson v. Sirmons, 476 F.3d 1131, 1139-40 n.7 (10th Cir. 2007) ("'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." (internal quotation marks omitted)).

Moreover, even if we were to assume, for purposes of argument, that Lott could circumvent this anticipatory procedural bar, there is no merit to his first and third arguments. Lott's "presumptive prejudice" argument is based upon the Supreme Court's decision in Doggett v. United States, 505 U.S. 647 (1992). In Doggett, the Court held that a delay of eight-and-one-half years between the

21

defendant's indictment and his arrest, which was caused by government

negligence, violated his Sixth Amendment right to a speedy trial. 505 U.S. at

657-58. In this case, in contrast, the delay was substantially shorter, roughly half

of the delay that was at issue in Doggett. Thus, it was reasonable for the OCCA

to have engaged in the Barker balancing test, rather than simply concluding that

the length of the delay, standing alone, warranted relief. As for Lott's assertion

that he was prejudiced by Lhyane's death, his explanation of that prejudice

simply makes no sense. Moreover, Lott's trial counsel made the jury aware that

unidentified Caucasian hairs were found at the Fowler crime scene. Precisely

how Lhyane's testimony would have further aided Lott in this regard is unclear.

That leaves only Lott's argument that he was prejudiced because the State

was able to strengthen its case against him by way of the additional DNA testing.

The OCCA, however, expressly rejected this argument, noting

> [t]he delays in the trial did not prevent [Lott] from challenging
> the expertise and credibility of any of the experts conducting DNA
> analysis. Further, the science of DNA testing is rapidly progressing
> and it was to the benefit of both the State and the defense to have the
> evidence subjected to the latest and most accurate type of analysis.
> Such testing could have very easily been exculpatory and therefore
> benefited [Lott]. The fact that the results proved favorable to the
> State and not [Lott] is not grounds upon which to base a finding of
> prejudice. . . . We find [Lott] was not prejudiced by the delays as his
> defense was not hindered or impaired.

Lott I, 98 P.3d at 332. Although Lott clearly disagrees with this analysis, he has

failed to identify any clearly established law that mandates a different result.

22

Likewise, he has failed to demonstrate that the OCCA's analysis of this argument is in any way contrary to, or an unreasonable application of, <u>Barker</u>.

### 5) Balancing of the Barker factors

Finally, Lott contends that the OCCA's balancing of the four <u>Barker</u> factors was unreasonable. But his only argument in support is that, instead of the OCCA's conclusion that two of the factors favored the State and two factors favored Lott, the OCCA should have treated "all four factors [as] favor[ing] [him]." Aplt. Br. at 43-44.

For the reasons we have outlined, however, Lott has failed to establish that the OCCA erred in concluding that two of the <u>Barker</u> factors favored the State. Consequently, Lott has in turn failed to establish that the OCCA's balancing of the <u>Barker</u> factors was erroneous.

## 2) Erroneous aiding and abetting instruction

In Proposition Two of his appellate brief, Lott contends that the state trial court violated his constitutional rights by instructing the jury that he could be found guilty of felony murder on an accomplice liability theory, even though the prosecution at a pretrial motions hearing had disavowed reliance on an aiding and abetting theory of felony murder. Relatedly, Lott contends that the prosecution and the state trial court effectively induced his trial counsel to act ineffectively and concede Lott's guilt on the felony murder charges without Lott's consent.

23

*a) Background facts*

As we have noted, the fourth amended information filed by the State on November 13, 2000, charged Lott with two counts of first-degree malice aforethought murder and, in the alternative, two counts of first-degree felony murder. The felony murder charges in the fourth amended information alleged, in pertinent part, that Lott was "aided and abetted by . . . Miller." State R., Vol. IV, at 735.

At a pretrial motions hearing on March 23, 2001, the state trial court and the parties discussed the question of whether the defense would be allowed to introduce evidence regarding Miller's potential involvement in the crimes. In the course of that discussion, the parties referred to the aiding and abetting language contained in the fourth amended information. To begin with, the prosecutor argued that the aiding and abetting language was "surplusage" that did not impose any "extra burden [on the State] to prove a connection between [Lott and Miller]." Mot. Hr'g Tr., at 16, Mar. 23, 2011. Defense counsel argued, in response, that "[t]hrough aiding and abetting they're going to have to show some sort of mental coming together between Lott and Miller," "[a]nd they can't." Id. at 19.

The prosecutor responded:

We have charged in count two the defendant as committing a felony murder, that he killed these two ladies in the course of raping them. There is no aider and abettor language in there at all. There is

24

the surplusage which charges Miller as -- as conjointly acting. That's not aider and abettor stuff. I don't need to have any language for aider and abettor.

   . . . .

All I got to show is -- is his commission of a felony rape, during the course of which these two ladies died. With or without Miller. It doesn't matter.

Id. at 35-36.

Defense counsel in turn stated:

What I want to say on the aiding and abetting, I don't know if we're -- I just think that [the prosecutor] and I are somehow confused and I think it might be my fault, but if he wants to charge Ronnie Lott with felony murder -- he has charged Ronnie Lott with felony murder, with aiding and abetting language in with Robert Miller.

If Ronnie Lott is guilty of felony murder, a rape homicide, then so be it, put on the evidence. But if you can't draw a connection -- and I've got some case law . . . that does say you have to show some sort of meeting of the minds, so to speak, for aiding and abetting.

If you got to show that, then any evidence we can put on pointing towards Robert Miller debunks not just the malice murder, but the felony murder. If we can put Robert Miller there and get the jury thinking, somebody committed this crime, but we're not sure who and we can't convict . . . Ronnie Lott simply because we've got some evidence out there as to both of them, then that's reasonable doubt.

The only way that we hurt ourselves with the Robert Miller stuff is if, in fact, they're right on an aiding and abetting theory. And I know [the prosecutor] keeps saying they're not alleging it, but it's in the language, and what I suspect is that we're going to put on all our evidence of Robert Miller, they're going to put on all their evidence of Ronnie Lott, and then, in closing argument, the State's going to tell the jury it doesn't matter who they believe because, even if they believe us, Ronnie Lott was aiding and abetting.

And what I'm saying is, under the law, we don't think they can do that and I've got the law here to show you, Your Honor, and if that's true, then it does make a big difference who the jury thinks. They may have some real suspicions about Ronnie Lott, you know, but if they got real suspicions about Robert Miller, too, and Ronnie Lott's charged alone, it may be reasonable doubt.

25

Id. at 37-38.

After further discussion, the prosecutor stated:

[The aider and abettor language in the information is] surplusage
and it should be deleted to the extent that this seems to be confusing
the issues. We're going to be entitled to an aider and abettor
instruction as soon as [the defense] offer[s] the Miller evidence.

. . . .

Any time a defendant offers that kind of evidence, that, folks, if
you believe Ronnie Lott raped these two women based on the DNA
evidence, and but you also think that the guy who hatched the
scheme and was rooting him on on the sideline is Robert Lee Miller,
he's just as guilty and he's just as eligible for the death penalty.

I mean, yeah, that's definitely what we're going to do, but as far
as that language charging him conjointly, it's surplusage, whether the
jury hears about, [sic] it whether it's stricken. That makes sense to
me.

Id. at 40-41.

Defense counsel asked the trial court, "can we still deal with the issue upon

aiding [and] abetting today?" Id. at 41. The trial court responded, "Let's wait

and see how the evidence shakes out [at trial]." Id.

At trial, the defense was permitted to introduce evidence regarding Miller's

potential involvement in the crimes. This included evidence of Miller's

statements to the police, some of which suggested an intimate knowledge of the

crimes that only someone present at the scene could have known, as well as

evidence that Miller was originally charged with and convicted of the Fowler and

Cutler murders.

At the conclusion of the first-stage evidence, the trial court instructed the

26

jury regarding the charges against Lott. With respect to the felony murder

charges, the instructions stated, in pertinent part:

> No person may be convicted of Murder In The First Degree (Felony Murder) unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:
> First, the death of a human;
> Second, the death occurred as a result of an act or event, which happened in the commission of a forcible rape and a First Degree Burglary[;]
> Third, caused by the defendant or any person engaged with the defendant while in the commission of a forcible rape and a First Degree Burglary[;]
> Fourth, the elements of forcible rape and First Degree Burglary the defendant is alleged to have been in the commission of . . . .

State R., Vol. VII, at 1211 (Instruction Number 7) (emphases omitted).

The jury instructions also addressed the concepts of principals and aiding

and abetting:

> All persons concerned in the commission of a crime are regarded by the law as principals and are equally guilty thereof. A person concerned in the commission of a crime as a principal is one who directly and actively commits the acts constituting the offense or knowingly and with criminal intent aids and abets in the commission of the offense or whether present or not, advises and encourages the commission of the offense.

Id. at 1215 (Instruction Number 10).

> Merely standing by, even if standing by with knowledge concerning the commission of a crime, does not make a person a principal to a crime. Mere presence at the scene of a crime, or acquiescence in its commission, without participation, does not make a person a principal to a crime.
> One who does not actively commit the offense, but who aids, promotes, or encourages its commission, either by act or counsel or

27

both, is not deemed to be a principal to the crime unless he did what he did knowingly and with criminal intent. To aid or abet another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting, or aiding in the commission of that criminal offense.

Id. at 1216 (Instruction Number 11). Notably, Lott did not object to any of these instructions.

Immediately following the trial court's reading of the first-stage instructions, the parties gave their respective closing arguments. The prosecution, during its initial closing argument, discussed the elements of first-degree felony murder:

> Want to walk you through here because we're not fussing about any of this. This is the one that is real easy because it's not in dispute in the evidence at all. First of all, that first element, death of a human, nobody's fighting about that.
> Second, that it occurred as a result of the act or event which happened in the commission of forcible rape and first degree burglary. There is no dispute in the evidence, parties aren't fussing at all that Zelma Cutler and Anna Fowler died during the commission of the acts of burglary and rape, okay. So that's not in dispute.
> Third, caused by the defendant or any person engaged with the defendant while in the commission of forcible rape and first degree burglary. Gang, that's not in dispute. We may be fussing about who did what. They may want you to believe it's Robert Miller who leans in and smothers Zelma Cutler or leans in and smothers the life out of Goldie Fowler instead of him because, as you can see, it doesn't make any difference in felony murder. Okay.
> Fourth, the elements of forcible rape and first degree burglary, you got to find that that's what was going on. Mr. Albert took care of that. He was laughing at me for suggesting that this wasn't a burglary. I think it was Mr. Albert. It may have been one of the other lawyers over yonder. They were -- Mr. Albert was angry at me in suggesting that the evidence was that this wasn't a rape.
> So we're not fighting about whether there was a burglary and a

rape going on. And even if you believe everything that the defense seems to be suggesting, that Robert Miller leaned in and did the killing, it doesn't matter.

Now here's why. The reason behind the rule, so you just don't think we do this. The reason behind the rule is, is that when two people agree to commit a crime and it involves one of these inherently violent crimes -- burglarizing a home when somebody's there, armed robbery, rape -- crimes that are so dangerous that if the State proves that you deliberately participated in the commission of that crime, that that intent to commit the crime substitutes for the intent of malice aforethought.

Now, it has a huge affect [sic] when we start talking about the death penalty, but in terms of guilt on first degree murder, if you knowingly, intentionally participate in one of these listed crimes, really dangerous crimes like burglary and robbery and rape, and somebody dies, you're on the hook for the murder.

Now again, big difference in penalty, but as far as whether or not you're guilty of murder, it's easy. So gang, if you can see this, you can see why when the defendant enters his plea of not guilty and you're kind of scratching your head, gee, there must be a catch, the only catch is he entered a plea of not guilty because, under this instruction, even if you believe the stuff that the defense is talking about, that it's Miller who did the killing, it doesn't matter.

Trial Tr., Vol. IX, at 1608-11.

Continuing, the prosecution discussed the principal and aiding and abetting instructions:

But what about Robert Miller? What about Robert Miller? Judge told you that you were going to get an instruction at the end of the case that was going to make all this clear and I want you to see how clear it really is.

All persons concerned, you're told in instruction number ten, in the commission of a crime are regarded by the law as principals and are equally guilty thereof. A person concerned in the commission of a crime as a principal is one who directly and actively commits the acts constituting the offense.

That's Ronald Lott. He actively commits the acts constituting the offense. But a principal can also be one who knowingly and with

29

criminal intent aids and abets in the commission of the events or, whether present or not, advises and encourages the commission of the offense?

What does that criminal intent thing mean? It's the design to commit a crime or acts, the probable consequences of which are criminal.

Here's the biggy. Hear's [sic] the biggy. It's instruction number eleven. Merely standing by with knowledge concerning the commission of a crime does not make a person a principal to the crime.

Now, this may fly in the face of common sense, obviously that's what Mr. Albert[, defense counsel,] had in mind when he was saying, doesn't it make Robert Miller as sick as -- he didn't say my client, but we are talking about Ronald Lott -- doesn't it make Robert Miller as sick as the rapist? Well, yeah; it just doesn't make you guilty.

Id. at 1612-13.

Defense counsel's closing argument focused in part on the possibility that Miller, rather than Lott, killed Fowler and Cutler. In discussing this issue, defense counsel stated, in pertinent part:

Last face [the victims] may have seen may have been Miller's, and that's the way you got to look at this case. We do cases about proof and about evidence. When [the prosecution] tell[s] you [it has] no evidence that Robert Miller was the killer, that cuts both ways because [it] also [has] no evidence what Ronald Lott was. None.

I don't know what you're going to do with that DNA [evidence], but at worst [the prosecution] [has] proven that Ronald Lott was the rapist which we told you a long time ago. At worst.

Id. at 1641.

You know, since they want to use DNA, let's use those terms. In proving this case in this courtroom, they cannot exclude Robert Miller as the killer. That's a DNA term for you. They cannot exclude, because we all know he was there, we all know he knew things he shouldn't have known, we all knew thing -- he knew things that go right to the death of these ladies, right to their bodies.

30

They cannot exclude in DNA terms Robert Miller as the killer and neither can you. That's what it comes down to, comes down to proof. Since they can't exclude him, then you have to have a reasonable doubt as to who the killer is. You may not like that. That's the way it is.

Id. at 1642-43.

The prosecution, in its final closing argument, seized on defense counsel's

statement that Lott was "at worst" the rapist:

All right. At most he's the rapist. At most Ronald Clinton Lott is the rapist of these two elderly ladies. [Defense counsel] just said it and that is guilty of felony murder, period. You can mark it down, check guilty on the box. He just said it. At most he's guilty of felony murder and that's what you have to decide right now.

Id. at 1645.

Nothing controverts that Ronald Clinton Lott is the rapist. As a matter of fact, his lawyer tells you that at worst that's what he is.

Id. at 1649.

Because the jury was provided with a general verdict form, it is unclear

whether they found Lott guilty of first-degree malice aforethought murder or first-

degree felony murder. See State R., Vol. VII, at 1248-49.

*b) The OCCA's rejection of Lott's claim on direct appeal*

On direct appeal, Lott complained that the state trial court "instructed the

jury that they could find [him] guilty if they believed that the deaths were caused

by someone aiding and abetting [him] in the commission of the charged felonies,"

and "[d]uring closing argument, [his] defense [counsel] conceded that [he] had

31

raped the ladies, but maintained that Miller caused the deaths."[3]  Direct Appeal

Br. at 45.  In other words, Lott argued that the state trial court instructed the jury

on an "uncharged theory of the case based on the defendant's defense," and that

those instructions effectively "resulted in [a] concession of guilt" by defense

counsel.  Id. at 46.

The OCCA rejected Lott's arguments:

> In his fourth assignment of error, Appellant contends the trial court erred by instructing the jury on aiding and abetting.  We review only for plain error as no objection was raised to the instruction. Bland v. State, 2000 OK CR 11, ¶ 49, 4 P.3d 702, 718, cert. denied, 531 U.S. 1099, 121 S.Ct. 832, 148 L.Ed.2d 714 (2001).
> In support of his contention, Appellant relies on Lambert v. State, 1994 OK CR 79, 888 P.2d 494.  In Lambert, the defendant was charged with malice aforethought murder.  The trial court gave instructions on felony murder.  The appellant argued he was not given sufficient notice of this theory in the information, and this Court reversed on this basis.  1994 OK CR 79, ¶¶ 45–48, 888 P.2d at 504.  The situation in the present case is very different.
> In a Fourth Amended Felony Information, filed approximately one year before trial, Appellant was charged with two counts of first degree malice aforethought murder for the deaths of Mrs. Fowler and Mrs. Cutler.  In the alternative, he was charged with two counts of felony murder by aiding and abetting Robert Lee Miller, Jr., who in the commission of first degree burglary and first degree rape killed the victims.  (O.R. 734–735).  The State's theory throughout the

---

[3] Lott also argued that at trial "[t]he defense relied on the charging information in choosing its defense, believing that the State would be required to show that [he] alone caused the death of the ladies during the commission of a rape and burglary."  Direct Appeal Br. at 44.  But that argument was clearly rebutted by what transpired at the March 23, 2001, motion hearing.  As noted, the prosecution agreed at that hearing to strike the aiding and abetting language from the fourth amended information, but it retained the right to reassert the language and rely on an aiding and abetting theory in the event that Lott presented evidence at trial of Miller's potential role in the murders.

32

proceedings was that Appellant committed the rapes, and that Appellant either killed the victims himself or he aided and abetted Miller in killing the victims. Unlike Lambert, Appellant was given plenty of notice concerning the State's alternative theories of guilt.

Further, the aiding and abetting instructions were warranted by the evidence. The State's evidence included the results of DNA testing showing Appellant was the donor of the semen found at the crime scenes, and that Miller had been excluded as the semen donor. The State also presented evidence showing Appellant had pled guilty to committing two other rapes under very similar circumstances as the charges on trial. During the cross-examination of several of the State's witnesses, the defense established that Miller had made certain statements about the Fowler/Cutler crimes which were not known to the general public, and that based in part upon those statements, Miller had been previously convicted of committing the Fowler/Cutler homicides. During re-direct examinations, the State elicited testimony that it was possible there were two intruders into the homes of Mrs. Fowler and Mrs. Cutler and that it was possible that one intruder killed the victims while the other watched. Additionally, during its case-in-chief, the defense introduced evidence concerning Miller's prior prosecution in the Fowler/Cutler cases. Accordingly, the trial court did not abuse its discretion in giving the instructions on aiding and abetting instructions. See Cannon v. State, 1995 OK CR 45, ¶ 25, 904 P.2d 89, 99. See also Slaughter v. State, 1997 OK CR 78, ¶ 63, 950 P.2d 839, 857 n. 9., cert. denied, 525 U.S. 886, 119 S.Ct. 199, 142 L.Ed.2d 163 (1998).

Appellant further argues defense counsel was ineffective as counsel admitted guilt as to the felony murder charge without Appellant's consent. This Court follows the test for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). See Bland, 2000 OK CR 11, ¶ 112, 4 P.3d at 730. Under Strickland's two-part test, the appellant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance. Unless the appellant makes both showings, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under

33

prevailing professional norms and that the challenged action could not be considered sound trial strategy.  Id. at 688–89, 104 S.Ct. at 2065.  The burden rests with Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id., 466 U.S. at 698, 104 S.Ct. at 2070.  When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed.  Id. at 697, 104 S.Ct. at 2069.  This Court has stated the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance.  Bland, 2000 OK CR 11, ¶ 112, 4 P.3d at 731.

Appellant relies on Jackson v. State, 2001 OK CR 37, ¶ 15, 41 P.3d 395, 398–399, where this Court reiterated its position that a concession of guilt does not amount to ineffective assistance of counsel, per se.  The Court stated, "a complete concession of guilt is a serious strategic decision that must only be made after consulting with the client and after receiving the client's consent or acquiescence."  Id. at ¶ 25, 41 P.3d at 400.  This Court placed the burden on the appellant to show that he was not consulted and that he did not agree to or acquiesce in the concession strategy.  Id.

Under the facts of the present case, and when all of the arguments are read in context, it is clear that guilt was not conceded.  The defense was well aware from early on that the State had DNA evidence which conclusively placed Appellant at the scene.  The defense filed numerous pre-trial motions challenging that evidence.  To counter the State's evidence at trial, the defense showed that the scientific evidence relied upon 14 years ago to convict Robert Miller of the Fowler/Cutler crimes—hair and blood analysis—had since been proven unreliable.  Defense counsel questioned whether DNA analysis might not also go the way of hair and blood analysis in light of future advances in forensic testing.  Counsel also argued that all the State had to prove Appellant's guilt was DNA and that relying on DNA was like gambling and relying on mere probabilities.  Defense counsel urged the jury not to let the State's experts decide the case for them.  The defense also presented evidence showing Miller's involvement in the Fowler/Cutler crimes and his knowledge of details that only someone present at the crime scenes would have known. Defense counsel argued in closing argument that the evidence showed Miller wasn't a mere observer to the crimes, but the

actual perpetrator of the crimes.

Defense counsel also challenged the State's alternative theories of guilt and argued the State could not assert that Miller was and was not the killer. Defense counsel argued that while Miller was in jail for the Fowler/Cutler crimes, other rape victims did not die. Defense counsel stated that when the State told the jury they had no evidence Miller was the killer, "that cuts both ways because they also have no evidence what Ronald Lott was. None." Counsel then stated, "I don't know what you're going to do with that DNA, but at worst they have proven that Ronald Lott was the rapist . . ." Defense counsel further argued that merely because Miller was not included as a donor of the semen found at the scene, that did not mean that he was not a rapist and a killer. Counsel argued it merely showed Miller did not ejaculate at the scene. Counsel concluded his closing argument by asserting the State had not proven that Miller was not the killer, and because of that reasonable doubt as to Appellant's guilt existed.

In light of this record, counsel's statement that at worst "they have proven [Appellant] was the rapist" was not a concession of guilt to the charged crimes. This was an isolated comment within defense counsel's approximately 11 page closing argument. Any perceived conciliatory aspect of the remark was not prejudicial to Appellant. Claiming that Appellant had not been involved at all would have completely destroyed counsel's credibility before the jury in light of the strong evidence of guilt. See Wood v. State, 1998 OK CR 19, ¶ 60, 959 P.2d 1, 15–16. From the record, it appears that minimizing Appellant's role in the crimes in light of the DNA evidence was the best possible method to gain an acquittal on the charges. Accordingly, we do not find counsel's performance deficient under the circumstances. This assignment of error is denied.

Lott I, 98 P.3d at 336-38 (alteration in original) (internal paragraph numbers

omitted).

*c) Lott's arguments in this federal habeas action*

In this appeal, Lott argues that "the OCCA . . . miss[ed] the point" because

"[t]he issue is not whether the evidence adduced at trial was sufficient to warrant

an aiding and abetting instruction," but rather "whether the prosecution should be

permitted to specifically disavow an aiding and abetting charge pretrial, proceed to try [him] on charges that do not include an aiding and abetting theory, and then invite the jury to convict [him] of murder as an aider and abettor." Aplt. Br. at 50. In support, Lott argues that his "entire defense was . . . based upon the State's reassurances that not only had it disavowed the aiding and abetting theory of felony murder liability, but also had stricken the aiding and abetting language from the fourth amended information." Id. at 51. "Only after the defense had presented its case," Lott argues, "and after defense counsel had conceded to . . . Lott's involvement in the rapes, did the State spring its trap and renege on its promise." Id.

The threshold, and clearly fatal, problem with Lott's arguments is that they are based on a series of incorrect statements regarding what transpired in the state trial court. As we have explained, the prosecution admittedly agreed at the March 23, 2001, motions hearing to strike the aiding and abetting language from the fourth amended information. Importantly, however, the prosecution expressly reserved the right to reassert that language in the event that Lott presented evidence of Miller's potential involvement in the charged crimes. And it is undisputed that Lott did precisely that at trial, i.e., he presented evidence of Miller's potential involvement in the murders. Thus, in no way did the prosecution "renege on its promise," nor could Lott's trial counsel have been surprised by the state trial court's decision to instruct the jury on aiding and

36

abetting. Indeed, as the OCCA found in rejecting these same arguments on direct appeal, Lott's trial counsel did not object to the trial court's aiding and abetting instructions. And because the state trial court read its instructions to the jury prior to the first-stage closing arguments, Lott's trial counsel was well aware that the jury would be permitted to consider an aiding and abetting theory of felony murder liability.

Relatedly, the OCCA expressly found that Lott's trial counsel did not, during the course of his first-stage closing arguments, concede Lott's guilt of felony murder. Although Lott disagrees with this finding, he has failed to rebut by clear and convincing evidence the presumption of correctness we must afford this finding under 28 U.S.C. § 2254(e)(1). As the OCCA correctly noted, a review of defense counsel's complete first-stage closing arguments reveals that defense counsel was attempting to persuade the jury that a reasonable doubt existed as to Lott's responsibility for the murders under either theory of liability. In this regard, defense counsel called into question the validity of the DNA evidence presented by the prosecution, noting particularly the evidence indicating that the prosecution had previously wrongfully convicted Miller based on what had proven to be faulty scientific evidence, such as blood type grouping and hair analysis.[4] And defense counsel not only cited evidence suggesting that Miller

---

[4] For example, defense counsel argued:

(continued...)

was present at the scene of both crimes, but also argued that Miller may have in fact been responsible for the crimes.[5]

Even if we were to assume that the OCCA's finding on the purported

_____

[4](...continued)
> We called Joyce Gilchrist to the stand, not for a spectacle, not to put her on trial, but to show you that the science in 1987 excluded this man[, Lott,] and included Robert Miller and that was their science of 1987 that I'm sure, although they tell you today it wasn't as good as science, I am sure that when they put her on that witness stand, it was science.
> . . . .
> But now they get up there and they say, well, this is 2001, we've got DNA now. Forget that old science. We've got the science now. How do we know that? Until they get all six billion people and get all our DNA so we can all be put down on a chart, how do they know that? And how do you know that?
> That's what this case comes down to. Science of 14 years ago was wrong. How do we know it's so right now? And how do you base a decision like this on that? That's what you have to decide.

Trial Tr., Vol. IX, at 1637-38. Only in that context did defense counsel then state, "I don't know what you're going to do with that DNA, but at worst they have proven that Ronald Lott was the rapist which we told you a long time ago. At worst." Id. at 1641. Defense counsel subsequently returned to the issue of the validity of the DNA evidence: "DNA. That's what it comes down to. . . . But are you going to let them use it to decide who lives and dies? That's what you got to decide. Probabilities, and 14 years ago science was wrong." Id. at 1642.

[5] Defense counsel argued, in pertinent part:

> They cannot exclude in DNA terms Robert Miller as the killer and neither can you. That's what it comes down to, comes down to proof. Since they can't exclude him, then you have to have a reasonable doubt as to who the killer is. You may not like that. That's the way it is.

Trial Tr., Vol. IX, at 1643.

concession issue constituted "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), and in turn accept Lott's characterization of what occurred, i.e., a concession of guilt by defense counsel that occurred without notice to, or the consent of, Lott, we are not persuaded that Lott would be entitled to federal habeas relief. Considering both the first and second stages of trial as a whole, it is clear that "a true adversarial criminal trial [was] conducted . . . [and] the kind of testing envisioned by the Sixth Amendment . . . occurred." United States v. Cronic, 466 U.S. 648, 656 (1984). Thus, we could not simply presume that Lott was prejudiced by counsel's purported concession. See Florida v. Nixon, 543 U.S. 175, 190-91 (2004). Instead, we would have to consider whether, under the second prong of Strickland, Lott was actually prejudiced by his counsel's actions. And, given the overwhelming evidence of Lott's involvement in the charged crimes, we could not say that Lott was prejudiced. During the first-stage proceedings, the prosecution presented evidence indicating that vaginal, anal, and oral swabs were taken from the bodies of both Fowler and Cutler. Two sources of DNA were found in the vaginal swab taken from Fowler: DNA from Fowler's own vaginal cells and DNA from a sperm donor. The DNA profile of the sperm donor was found to match Lott's DNA profile, and the probability of randomly selecting a matching profile approximately 1 in 15.7 quadrillion in the African-American population. Similarly, the sperm samples taken from Cutler were found to match Lott's DNA profile (and Miller was excluded as the source of the

39

sperm).  In short, the DNA evidence alone overwhelmingly established that Lott

was responsible for the rapes of Fowler and Cutler.[6]  Because it was undisputed

that Fowler and Cutler died during the commission of those crimes, Lott was

clearly guilty of felony murder.  And lastly, there is no basis to conclude that

counsel's purported concession during the first-stage proceedings had any

prejudicial impact during the second-stage proceedings.  See generally id. at 191-

92 (suggesting that, in a capital case involving overwhelming evidence and a

heinous crime, defense counsel must attempt to utilize first- and second-stage

strategies that are logically consistent).  Thus, in sum, any purported concession

of guilt by Lott's counsel was simply not prejudicial to Lott.

As a final matter, we conclude there is no merit to Lott's assertion that the

state trial court's instruction regarding aiding and abetting "'by itself so

[infected] the entire trial that the resulting conviction violates due process.'"

Aplt. Br. at 51-52 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  As the

OCCA aptly concluded, Lott "was given plenty of notice concerning the State's

alternative theories of guilt."  Lott I, 98 P.3d at 336.  Moreover, the trial court's

aiding and abetting instruction was amply supported by the evidence presented by

the defense at trial attempting to suggest that Miller, rather than Lott, was

responsible for murdering Fowler and Cutler.

---

[6] Lott all but concedes this point in his appellate brief: "The presence of
Mr. Lott's DNA at the crime scenes proved the Fowler and Cutler rapes."  Aplt.
Br. at 59.

### 3) Admission of other-crimes evidence

In Proposition Three of his appellate brief, Lott contends that he was deprived of his right to a fundamentally fair trial due to the admission at trial of evidence that he was convicted of the Marshall and Hoster rapes.

*a) Background*

Prior to Lott's trial, the prosecution filed a pleading entitled, "NOTICE OF INTENT TO USE EVIDENCE OF OTHER CRIMES." State R., Vol. IV, at 637. The pleading essentially notified the state trial court and the defense of the prosecution's intention to introduce evidence at trial of the Marshall and Hoster rapes. Lott filed a written motion objecting to the introduction of this evidence. On November 6, 2000, the state trial court overruled Lott's motion, concluding that the proposed evidence tended to prove identity due to an unusual modus operandi.

At Lott's trial, the prosecution, consistent with the trial court's pretrial ruling, was permitted to introduce evidence of Lott's involvement in the Marshall and Hoster rapes. This included fact witnesses who described the circumstances of the Marshall and Hoster rapes. It also included testimony from Robert Thompson, a former Oklahoma City police officer who was employed at the time of trial as the chief investigator for the public defender's office. Thompson testified that he had worked on Miller's post-conviction defense team and, in the course of doing so, concluded through his investigative efforts that there were

41

significant similarities between the Fowler and Cutler homicides and the Marshall

and Hoster rapes.  Lastly, the evidence included testimony from Gerald McKenna,

an inspector with the Oklahoma City Police Department's sex crimes unit.

McKenna testified generally about serial rapists and their methods.  McKenna

opined that there was no reason to doubt Lott's involvement in murdering and

raping Fowler and Cutler simply because he did not kill Marshall and Hoster.

McKenna also discussed the similarities between the four crimes.

At the conclusion of the first-stage evidence, the state trial court instructed

the jury regarding the proper use of this evidence:

> Evidence has been received that the defendant has committed
> offenses other than those charged in the information.  You may not
> consider this evidence as proof of the guilt or innocence of the
> defendant of the specific offenses charged in the information.  This
> evidence has been received solely on the issue of the defendant's
> alleged common scheme or plan and/or identity.  This evidence is to
> be considered by you only for the limited purpose for which it was
> received.

State R., Vol. VII, at 1220 (Instruction Number 15).

*b) Clearly established Supreme Court precedent*

Lott points to the decision in Lisenba v. California, 314 U.S. 219 (1941), as

providing the clearly established federal law applicable to his claim.[7]  In Lisenba,

_____

[7] Lott cites to a number of federal circuit decisions.  But none of those
constitute clearly established federal law for purposes of 28 U.S.C. § 2254(d)(1).
Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (holding that "circuit precedent
does not constitute 'clearly established Federal law, as determined by the
Supreme Court'" for purposes of § 2254(d)(1) and thus "cannot form the basis for
(continued...)

42

the Supreme Court outlined a general due process standard that applies to criminal trials:

> As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.

314 U.S. at 236.

Although not cited by Lott, two other Supreme Court decisions appear to be applicable. In Payne v. Tennessee, 501 U.S. 808, 825 (1991), the Supreme Court held that when a state court admits evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." And in Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), the Court made clear that this principle holds true regardless of whether the evidence at issue was properly admitted pursuant to state law.

*c) Lott's direct appeal*

In his direct appeal, Lott argued that the state trial court erred in admitting evidence of other crimes in violation of his constitutional right to a fair trial. In particular, Lott argued that "evidence of the Hoster/Marshall rapes did not tend to establish any fact of consequence other than the impermissible intermediate

---

[7](...continued)
habeas relief under AEDPA").

43

inference that since . . . Lott had later raped two other people, he must also have raped and killed . . . Cutler and . . . Fowler." Direct Appeal Br. at 35. Lott also argued that "the crimes . . . were not unusual enough to indicate the identity of the perpetrator as having committed all four." Id. at 39.

The OCCA rejected Lott's arguments:

Appellant contends the trial court erred in admitting evidence of the sexual assaults on Mrs. Marshall and Mrs. Hoster. Appellant relies on prior case law from this Court where we have stated that "similarity between crimes, without more, is insufficient to permit admission" of evidence of other crimes. See Hall v. State, 1980 OK CR 64, ¶ 5, 615 P.2d 1020, 1022.

Prior to trial, the State filed a Notice of Intent to Use Evidence of Other Crimes and Brief in Support. The State alleged the similarities between the Fowler/Cutler homicides and the Marshall/Hoster assaults were "relevant as an aid in determining the identity of the assailant. Also, the evidence is admissible as being part of a common scheme or plan since it demonstrates a highly distinct method of operation." The State cited 37 similarities between the Fowler/Cutler crimes and the Marshall/Hoster crimes. After hearing argument, the trial [sic] found the other crimes evidence to be relevant and admissible.

The basic law is well established—when one is put on trial, one is to be convicted—if at all—by evidence which shows one guilty of the offense charged; and proof that one is guilty of other offenses not connected with that for which one is on trial must be excluded. Burks v. State, 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, overruled in part on other grounds, Jones v. State, 1989 OK CR 7, 772 P.2d 922. See also Hall v. State, 1985 OK CR 38, ¶ 21, 698 P.2d 33, 37. However, evidence of other crimes is admissible where it tends to establish absence of mistake or accident, common scheme or plan, motive, opportunity, intent, preparation, knowledge and identity. Burks, 1979 OK CR 10, ¶ 2, 594 P.2d at 772. To be admissible, evidence of other crimes must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear

44

and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions. Welch v. State, 2000 OK CR 8, ¶ 8, 2 P.3d 356, 365, cert. denied, 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000).

When other crimes evidence is so prejudicial it denies a defendant his right to be tried only for the offense charged, or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character, the evidence should be suppressed. Id. Where, as here, the claim was properly preserved, the State must show on appeal that admission of this evidence did not result in a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right. Id. at ¶ 10, 2 P.3d at 366.

This Court has allowed evidence of other crimes or bad acts to be admitted under the "plan" exception of § 2404(B) where the methods of operation were so distinctive as to demonstrate a visible connection between the crimes. Id. at ¶ 12, 2 P.3d at 366–67. See also Aylor v. State, 1987 OK CR 190, ¶ 5, 742 P.2d 591, 593; Driskell v. State, 1983 OK CR 22, ¶ 23, 659 P.2d 343, 349; Driver v. State, 1981 OK CR 117, ¶ 5, 634 P.2d 760, 762–63. Distinctive methods of operation are also relevant to prove the identity of the perpetrator of the crime. Eberhart v. State, 1986 OK CR 160, ¶ 23, 727 P.2d 1374, 1379–80.

In this case, there is a substantial degree of similarity between the Marshall/Hoster assaults and the Fowler/Cutler homicides. The similarities show a visible connection sufficient to characterize a common scheme and to be probative on the issue of identity of the perpetrator. Briefly summarized, these similarities include: all four victims were white females over the age of 71 who lived alone; all four victims lived on the south side of the street and on corner lots; the back porch screen door was cut on the homes of three of the victims; the breaker box for the electricity to the residence was shut off in the homes of three of the four victims; entry to the residence was gained through a rear door in all four homes; a back door window was broken in three of the homes; two of the victims were awake when their homes was [sic] broken into and they were forced to their bedrooms; all four victims were raped vaginally while in their bedrooms; two of the four victims were also anally raped; all four victims were raped either late at night or in the early morning; all four victims were beaten about the head, face and arms; all four

45

victims suffered vaginal tears and bleeding; a knotted rag was found on the beds of three of the victims; a pillow was placed over the faces of three of the victims during the assault; none of the residences occupied by the four victims were ransacked and nothing of any significant value was taken from any of the homes; all four assaults occurred within an eight month time period with the Fowler/Cutler crimes occurring four months apart and the Marshall/Hoster crimes occurring two months apart; all four victims lived within three miles of each other; Appellant lived with his mother or sister near the Fowler/Cutler homes at the time of their murders and he lived with his brother near the Marshall/Hoster homes at the time of their assaults.

Appellant contends there were just as many differences as there were similarities between the crimes. Chief among those differences is the fact that two of the victims were left alive while two were killed. Appellant argues that at the time these four crimes occurred, numerous instances of rapes and home invasions of elderly women were being reported in the media. Appellant asserts the crimes in this case were not unusual enough to point to a signature of one individual perpetrator. We disagree. The similarities in this case are far greater than those in Hall v. State, 1980 OK CR 64, ¶ 6, 615 P.2d at 1022 relied upon by Appellant (similarities limited to each rape took place in an automobile, all three victims were under the age of consent, and each rape was committed in Tulsa County). Further, the similarities between the Fowler/Cutler homicides and the Marshall/Hoster assaults show a method of operation so distinctive as to demonstrate a visible connection between the crimes. In crimes involving sexual assaults, this Court has adopted a greater latitude rule for the admission of other crimes. Myers, 2000 OK CR 25, ¶¶ 21–24, 17 P.3d at 1030. See also Driskell, 659 P.2d at 349.

We further uphold the trial court's ruling that the probative value of the evidence of the Marshall/Hoster assaults outweighed its prejudicial impact. See Mayes v. State, 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1309–10, cert. denied, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995). The evidence was necessary to support the State's burden of proof despite its prejudicial nature. Finding the evidence properly admitted, this proposition is denied.

Lott I, 98 P.3d at 334-36 (footnote and internal paragraph numbers omitted).

46

*d) Lott's challenge to the OCCA's decision*

In this appeal, Lott concedes that, "had [his] DNA not been present to prove that he raped . . . Cutler and . . . Marshall, the 'other crimes' evidence, which the OCCA admitted was prejudicial, may have been necessary to support the State's burden of proof." Aplt. Br. at 66. He argues, however, that "[g]iven the presence of [his] DNA at the Fowler/Cutler crime scenes, . . . the Marshall and Hoster rapes were hardly necessary to prove identification in regards to the Fowler/Cutler crimes." Id. He therefore argues that "[t]he OCCA's determination that the 'other crimes' evidence was necessary to support the State's burden of proof was objectively unreasonable in light of the facts presented at trial and should be afforded no deference under 28 U.S.C. § 2254(d)(2)." Id. at 65-66.

As an initial matter, we note that the other-crimes evidence was properly admitted under Oklahoma state law. As the OCCA explained, the four crimes bore substantial similarities that, in the view of the prosecution's expert witness, indicated they were committed by the same serial rapist. Thus, the evidence was relevant for purposes of proving the identity of the person responsible for raping Fowler and Cutler. As for the OCCA's conclusion that the probative value of the evidence outweighed its prejudicial impact, it is important to note that the state trial court's ruling on this issue occurred prior to trial, and thus prior to the state trial court hearing the precise nature of the prosecution's DNA evidence. Lott

47

may well be correct that the DNA evidence, standing alone, would have been sufficient to allow the jury to convict him. But the state trial court was not privy to that evidence at the time of its ruling and Lott did not renew his objection to the other-crimes evidence at trial. Moreover, despite the prosecution's introduction of the DNA evidence, Lott's defense team focused its efforts on attacking the legitimacy of that DNA evidence (suggesting to the jury that it was possible that the DNA evidence might be later discredited, as had the purported scientific evidence that was previously used to convict Miller of the crimes). Thus, we cannot say that the OCCA erred in concluding that the other-crimes evidence was indeed necessary to support the prosecution's burden of proof.

That leaves, at most, only the question of whether the other-crimes evidence was "so unduly prejudicial that it render[ed] [Lott's] trial fundamentally unfair." Payne, 501 U.S. at 825. Notably, Lott did not argue this point in his direct appeal, and thus the OCCA did not address it. Consequently, the argument is subject to an anticipatory procedural bar in these federal habeas proceedings. See Anderson, 476 F.3d at 1140 n.7.

And even if Lott could overcome this anticipatory procedural bar, a review of the state court record indicates that Lott's trial was not rendered fundamentally unfair by the admission of the Marshall and Hoster evidence. Even aside from the other-crimes evidence, the prosecution's evidence of Lott's guilt of the Fowler and Cutler rapes/murders (particularly the DNA evidence) was overwhelming.

48

Further, it is clear that the Marshall and Hoster evidence would have, at a minimum, been admissible by the prosecution during the second-stage proceedings in order to prove the continuing-threat aggravator. Lastly, the jury rejected the continuing-threat aggravator, and thus it does not appear that the Marshall and Hoster evidence had any impact on the jury's sentencing decision.

**4) Prosecutorial misconduct—introduction of hearsay statements of Robert Miller**

In Proposition Four of his appellate brief, Lott contends that the prosecution engaged in prejudicial misconduct by "injecting hearsay statements of Robert Miller into both stages of . . . trial" in order "to prove that," even though Miller may have been present during the commission of the crimes, "it was . . . Lott who killed both victims because he needed to eliminate witnesses." Aplt. Br. at 68. Lott also complains that the prosecutor "put [an additional] hearsay statement before the jury," i.e., that the victims begged for their lives and were orally sodomized by Lott. Id. at 74. According to Lott, this misconduct violated "his right to confrontation guaranteed under the Sixth Amendment." Id. at 68. And Lott asserts that "Crawford v. Washington, 541 U.S. 36 (2004), requires that [he] receive a new trial." Aplt. Br. at 72.

Lott's claim derives, in part, from the first-stage testimony of McKenna, the inspector with the Oklahoma City Police Department's sex crimes unit. During his direct examination, McKenna opined that there was no reason to doubt

49

Lott's involvement in raping and murdering Fowler and Cutler simply because of the fact that he did not kill either Marshall or Hoster. On cross-examination, McKenna testified that, based upon his experience, sex crimes of the type at issue are committed by lone perpetrators, and not by two people. On redirect, McKenna opined that the Fowler and Cutler murders were committed to eliminate witnesses, and not because the suspect received sexual gratification from the killings. The prosecutor and McKenna then engaged in the following colloquy:

Q. Well, you were talked to about the Miller interviews and, to be fair to you, neither side, them or us, gave you the transcripts. You have not read the stacks of the transcripts of the Miller interview, right?

A. No, sir, I have not.

Q. Okay. When Robert Miller is asked about what he saw, he, the killer -- never himself -- he saw the killer do and he describes the raping, the oral sodomy that he saw, the begging for lives. And he's asked the question, why did he kill her? And his first answer is I don't know. He's asked again, why did he kill her? And the answer is, he was scared. Scared of what? She was going to tell on him.
      Now, I understand you haven't reviewed this, so whether or not he was led to these statements or whether and whether -- and to be very clear, I agree a hundred percent with Mr. Albert and the rest of those folks over there for what it's worth, the State's position is that Robert Miller's statements reflect that he was present and we're going to talk more about that later. You may not agree with that. Bob Thompson sure doesn't.
      But my point to you is is [sic] that if Robert Miller was there or he had some other way of learning what Ronnie Lott was thinking, this answer, he killed her because he was scared she would tell on him, is that consistent with your opinion that this was a rape/murder done to kill in order to silence a witness?

A. Yes, sir, it is.

50

Trial Tr., Vol. VIII, at 1492-93.

Lott's claim also derives from the prosecutor's second-stage closing arguments. During those arguments, the prosecutor addressed the allegations that the Fowler and Cutler murders were committed for the purpose of avoiding or preventing a lawful arrest or prosecution:

> This aggravating circumstance is not established unless the State's proved beyond a reasonable doubt, first, that there was another crime separate and distinct from the murder and, secondly, that the defendant committed the murder with the intent to avoid being arrested or prosecuted for that other crime.
> Ladies and gentlemen, again, I submit to you, this element -- this aggravating circumstance is proved without dispute. There is no evidence to contest this. The defendant raped both of these women.
> He, as Butch McKenna testified, following the cross examination by [defense counsel] over there, that rapists kill, serial rapists kill for two reasons. The act of the killing is the thing which gives them their sexual boost. For them, the rape is just a -- is just a thing on the way to the killing that's really their deal or it's all about the control and rape and the killing is done to silence a witness.
> The evidence of that is made absolutely clear by the fact that after Robert Miller had been arrested for these crimes, he quit killing and, instead, moved to threats to try and -- and other measures that y'all have already heard about to conceal his identity as the rapist.
> Robert Miller. Robert Miller in his interview with David Shupe. Why did he kill her? I don't know. Why did he kill her? He was scared. Scared of what? She was going to tell on him.
> You hardly needed that statement from Robert Miller to confirm that the reason why the defendant did it is she was going to tell on him because that's what Grace Marshall and Eleanor Hoster did when he left them alive.
> Ladies and gentlemen, we believe that the evidence on this is undisputed that these murders were committed to prevent lawful arrest and prosecution. The thing about this one is even if the defense that was offered to you in the first stage, that Robert Miller's the bad guy here, this aggravator is still present, it's still present.

51

Id., Vol. X, at 1795-97.

*a) Clearly established Supreme Court precedent*

As noted, Lott points to the Supreme Court's decision in Crawford as supplying the clearly established federal law applicable to his claim. In Crawford, the Court addressed the question of whether the introduction at a criminal trial of a witness's tape-recorded statement to the police describing the crime at issue, where the accused has no opportunity for cross-examination of that witness, violates the Sixth Amendment Confrontation Clause's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." 541 U.S. at 38. The Court, after recounting the history of the Confrontation Clause, held that "even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class." Id. at 53. The Court further held that "[t]he historical record . . . support[ed] a second proposition: that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53-54. Ultimately, the Court held that "[w]here testimonial statements are at issue [in a criminal trial], the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Id. at 68-69. In other words, the Court held,

52

"the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination."  Id. at 68.

*b) Lott's direct appeal*

Lott first asserted his arguments on direct appeal.  Specifically, Lott complained that the prosecution, during its first-stage examination of McKenna, improperly "used hearsay/facts not in evidence from its 'key eyewitness', Robert Miller, that [Lott] killed . . . Fowler and . . . Cutler for the purpose of avoiding arrest or prosecution."[8]  Direct Appeal Br. at 83.  And Lott argued that "[t]his error warrant[ed] reversal . . . due to [the] deprivation of [his] right to confront witnesses against him, a fundamental right."  Id. at 84.

The OCCA rejected Lott's arguments:

> In a related assignment of error, proposition number eleven, Appellant argues the prosecutor injected facts not in evidence through the questioning of Inspector McKenna.  Specifically, Appellant complains that through the questioning of McKenna, the State put Robert Miller's statements before the jury in order to prove that the homicides were committed for the purpose of avoiding arrest or prosecution, and to show that the victims begged for their lives and were orally sodomized.  Appellant asserts McKenna's testimony concerning Miller's statements was inadmissible hearsay that influenced the first stage verdict.  He argues the alleged error impacted the second stage, when combined with other second stage errors; it deprived him of a reliable sentencing stage.
>
> Initially, we note that our review is for plain error only as none of the challenged testimony was met with contemporaneous defense objections.  Simpson v. State, 1994 OK CR 40, ¶ 19, 876 P.2d 690, 698.

---

[8] Lott did not complain about the references to Robert Miller in the prosecution's first-stage opening statement.

Inspector McKenna first testified to Robert Miller's involvement in the case on cross-examination. Defense counsel cross-examined McKenna extensively on statements made by Miller despite McKenna's acknowledgement [sic] that he never interviewed Miller and was not aware of the substance of Miller's statements. Defense counsel repeatedly reviewed statements made by Miller and asked McKenna his opinion as to whether or not the person making those statements would have been at the scene of the crime. This type of questioning continued on re-direct examination. McKenna testified his opinion that the case was a rape/murder done to silence a witness was consistent with the conclusion that Miller's statements indicated he was present at the scene or had some other way of learning what Appellant was thinking. However, Appellant does not cite, nor do we find in the record, that McKenna testified that based upon Miller's statements, the victim's begged for their lives and were orally sodomized.

Any error in McKenna's testimony concerning Miller's statements has been waived as defense counsel, and not the State, opened up the issue of Miller's statements with McKenna.[FN10] In fact, the State objected to the questioning during cross-examination for the reason that McKenna had not read all of Miller's statements. The trial court overruled the objection and permitted the questioning. This Court has repeatedly held that an appellant will not be permitted to profit by an alleged error that he or his counsel in the first instance invited by opening the subject or by his or her own conduct, and counsel for the defendant may not profit by whatever error was occasioned by the admission of such incompetent evidence. Murphy v. State, 2002 OK CR 24, ¶¶ 30–31, 47 P.3d 876, 882–882, cert. denied, 538 U.S. 985, 123 S.Ct. 1795, 155 L.Ed.2d 678 (2003); Welch v. State, 1998 OK CR 54, ¶ 10, 968 P.2d 1231, 1240; cert. denied, 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999); Staggs v. State, 1986 OK CR 88, ¶ 9, 719 P.2d 1297, 1299.

> FN10. As the defense initiated and invited McKenna's testimony concerning Miller's statements, we find Crawford v. Washington, [541] U.S. [36], 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) is not implicated.

Further, Appellant asserts the State argued evidence in support of the "avoid arrest" aggravator as direct evidence of Appellant's intent. Appellant directs us to the following argument during the State's

54

second stage closing. "Robert Miller. Robert Miller in his interview with David Shupe. Why did he kill her? I don't know. Why did he kill her? He was scared. Scared of what? She was going to tell on him." Reviewing for plain error only, we find none.

The record shows that in support of the aggravator of "avoid arrest", the State presented Inspector McKenna's expert opinion that the murders were committed to eliminate witnesses. McKenna testified his opinion was not based upon any statements made by Robert Miller, but on his years of investigating hundreds of sexually related homicides. McKenna testified Miller's statement simply corroborated his opinion. The prosecutor's comments during closing argument were based on the evidence and did not deprive Appellant of a fair sentencing proceeding. See Bland, 2000 OK CR 11, ¶ 105, 4 P.3d at 729.

Lott I, 98 P.3d at 345-46 (internal paragraph numbers omitted).

*c) Lott's challenge to the OCCA's decision*

Lott contends in this federal habeas appeal that, "[b]ecause there was no adjudication on the merits of [his] confrontation claim, no deference is warranted [to the OCCA's decision] under 28 U.S.C. § 2254(d)." Aplt. Br. at 71. Lott, however, is clearly incorrect on this point. As the above-quoted language from the OCCA's decision makes clear, the OCCA concluded that Crawford was inapplicable to Lott's case, and that Lott's rights under the Confrontation Clause were not violated, because Lott's counsel "initiated and invited McKenna's testimony concerning Miller's statements." Lott I, 98 P.3d at 345 n.10.

For purposes of our review, the OCCA's determination involves both a threshold factual finding, i.e., that Lott's counsel was the one who initiated the questioning of McKenna concerning Miller's statements, and a resulting legal

55

conclusion, i.e., that the OCCA's invited error doctrine precluded Lott from asserting a <u>Crawford</u> challenge. After carefully examining the trial transcript, we are unable to say that the OCCA's threshold factual finding was "unreasonable . . . in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As the OCCA correctly noted, it was Lott's counsel who first introduced Miller's statements into evidence by cross-examining McKenna regarding Miller's statements, even though McKenna stated that he had neither interrogated Miller nor reviewed the transcript of Miller's statements.

To be sure, Lott suggests that it was the prosecutor who in fact first introduced Miller's statements to the jury. But a review of the trial transcript proves Lott wrong on this point. During the first-stage opening statements, the prosecution began by providing the jury with a brief chronological history of the events that lead to Lott being charged with the Fowler and Cutler murders. In the course of doing so, the prosecution noted that after Fowler and Cutler were murdered, the "police flooded the neighborhood" and began interviewing potential suspects. Trial Tr., Vol. III, at 447. "[O]ne of the folks they stopped," the prosecution asserted, "immediately caught their attention, was a fellow named Robert Lee Miller." <u>Id.</u> The prosecution proceeded to state:

> But [the police] begin asking [Miller] questions and Robert Miller begins making statements that he does not know about [the murders], and he begins making statements that cause the police to want to

56

> interview him.
>
> Over the next dozen hours or so and the next couple of days, Robert Miller is interviewed by police where he makes a number of statements that just make no sense whatsoever, complete jibberish.
>
> But yet in the middle of jibberish there are statements which caused the police to connect those statements with things at the scene that were a you had to be there kinds of things, not like the kind of things that you would guess, not things he was told or that were in the news, and so the police focused their suspicion on Robert Miller.

Id. at 448. The prosecution then explained to the jury how Miller was charged, convicted, and ultimately exonerated of the Fowler and Cutler crimes. Thus, in sum, although the prosecutor first made general reference to Miller's statements to the police, the prosecutor did not describe for the jury any statements from Miller that were damaging to Lott. Nor, importantly, did the prosecutor first attempt to introduce Miller's statements into evidence. Thus, as we have concluded, the OCCA's factual finding on this issue was entirely reasonable.

As for the OCCA's application of its own invited error doctrine, the question for us is whether that results in Lott's Crawford claim being procedurally barred for purposes of federal habeas review. "'A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Walker v. Martin, 131 S. Ct. 1120, 1127 (2011) (alteration in original) (quoting Beard v. Kindler, 130 S. Ct. 612, 614 (2009)) (internal quotation marks omitted). "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of

57

the claim on the merits." Id. "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" Id. (quoting Kindler, 130 S. Ct. at 618).

The OCCA's decision satisfies both of these requirements. To begin with, it is beyond dispute that the OCCA's rejection of Lott's Crawford claim rested exclusively on a state law ground, specifically a state procedural barrier to adjudication of the claim on the merits, that was independent of the federal question posed by the claim. See Sandoval v. Ulibarri, 548 F.3d 902, 912 (10th Cir. 2008) (treating New Mexico Court of Appeals' application of its invited error doctrine as an independent state procedural ground). In turn, our review of Oklahoma case law persuades us that this state law ground, i.e., the invited error doctrine, is firmly established and regularly followed by the OCCA. See Cuesta-Rodriguez v. State, 241 P.3d 214, 237 (Okla. Crim. App. 2010) (applying invited error doctrine); Welch v. State, 968 P.2d 1231, 1240 (Okla. Crim. App. 1998) ("Any error in the prosecutor's inquiry in this case must be deemed invited error as Appellant initially raised the issue during his direct examination."); Pierce v. State, 786 P.2d 1255, 1259 (Okla. Crim. App. 1990) ("We have often recognized the well established principal [sic] that a defendant may not complain of error which he has invited, and that reversal cannot be predicated upon such error."); Casey v. State, 732 P.2d 885, 888 (Okla. Crim. App. 1987) ("The rule is well settled that a party may not complain of error which he himself has invited.");

58

Griffin v. State, 287 P. 820, 822 (Okla. Crim. App. 1930) ("Counsel for defendant invited whatever error was occasioned by the admission of this alleged incompetent evidence and cannot profit by the same.").

Of course, we could still address Lott's Crawford claim on the merits if Lott could "'demonstrate cause and prejudice or a fundamental miscarriage of justice.'" Johnson v. Champion, 288 F.3d 1215, 1226-27 (10th Cir. 2002) (quoting English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998)). But Lott makes no attempt to establish cause and prejudice. And, given the overwhelming evidence establishing Lott's involvement in the Fowler and Cutler murders, we are not persuaded that a fundamental miscarriage of justice will occur if we treat his Crawford claim as procedurally barred.

## 5) *Trial counsel's failure to investigate and present mitigating evidence*

In Proposition Five of his appellate brief, Lott contends that his trial counsel was ineffective for failing to investigate and present at the second-stage trial proceedings available mitigating evidence. According to Lott, this included evidence that:

1) he is the youngest of ten children;

2) he was born into extreme poverty in rural Texas, with his siblings and parents sharing a five-room shack with no heat or running water;

3) he spent the first three weeks of his life in the hospital, and his mother was paralyzed during the first year of his life, which interfered with their bonding relationship;

59

4) as a child, he and his family rarely had enough to eat;

5) his father was abusive, mean, and emotionally unavailable, and, on a regular basis, he corporally punished the children with large switches over the slightest perceived infraction or no infraction at all;

6) his siblings typically left the family home around the age of fifteen, in order to get away from their abusive father;

7) when he was ten years old, his mother left his father and took Lott and the next oldest sibling, Mageline, and moved to Lawton, Oklahoma;

8) after living in Lawton for a year, he and his mother moved to Oklahoma City;

9) his mother worked two jobs in Oklahoma City, leaving him virtually parentless at the age of eleven;

10) he began experimenting with drugs and alcohol at age eleven;

11) when he was twelve years old, his mother kicked him out of her home and he was forced to live on the streets;

12) when he was in the eighth grade, he would occasionally stay with a friend, Rick Berry, and Berry recalled Lott being filthy and hungry and having to sneak into his mother's home to steal food;

13) at age fourteen, he was arrested by authorities for unauthorized use of a motor vehicle and placed on juvenile probation;

14) at age sixteen, his mother informed juvenile authorities that he had violated probation for "lack of parental control" and he was placed in the Oklahoma Children's Center (OCC) juvenile home in Taft, Oklahoma;

15) he was held in OCC beyond completion of his sentence because the Oklahoma Department of Human Services had no place to release him to;

16) he was ultimately released from OCC in 1978, approximately six months before he turned eighteen;

17) in 1979, an investigation was conducted into Oklahoma's juvenile facilities, including OCC, and widespread abuses were found to have occurred during the time he was incarcerated at OCC, including hog-tying children, leaving them in solitary confinement for extended periods of time, keeping them after completion of their sentences without due process, and not providing education;

18) upon his release from OCC, he began living in Oklahoma City and doing landscaping work;

19) in 1985, he was in a car accident, received a mild to moderate head injury to the frontal lobe area, and was knocked unconscious for approximately thirty minutes;

20) while incarcerated in 1988, he experienced headaches of such severity that he was transported to a hospital for evaluation and treatment;

21) intelligence testing revealed inconsistencies in his cognitive functioning suggestive of brain damage;

22) neuropsychological testing and evaluation revealed the same inconsistencies, indicating that he suffered cognitive dysfunction, with causation unknown, and had an overall IQ of 74, and fit into a borderline mental retardation classification;

23) Dr. Jeanne Russell, a psychologist, conducted a risk assessment prior to trial and concluded that, although he would continue to pose a risk of violence in society at large, he would not pose a risk of future violence in a prison setting (with the unavailability of his target victims and a structured environment).

Aplt. Br. at 88-90.

*a) Clearly established Supreme Court precedent*

Lott's claim of ineffective assistance of trial counsel is governed by the

61

standards outlined in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In

<u>Strickland</u>, the Supreme Court held that "[a] convicted defendant's claim that

counsel's assistance was so defective as to require reversal of a conviction or

death sentence has two components." 466 U.S. at 687. "First," the Court noted,

"the defendant must show that counsel's performance was deficient." <u>Id.</u> "This

requires showing that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

<u>Id.</u> "Second," the Court noted, "the defendant must show that the deficient

performance prejudiced the defense." <u>Id.</u> "Unless a defendant makes both

showings," the Court held, "it cannot be said that the conviction or death sentence

resulted from a breakdown in the adversary process that renders the result

unreliable." <u>Id.</u>

Notably, the Supreme Court has, on several occasions in recent years, been

critical of, and deemed unconstitutional, a trial attorney's failure to thoroughly

investigate and present at the sentencing phase of a capital trial available

mitigating evidence. All of these cases, however, have involved inexcusable

neglect on the part of trial counsel, rather than strategic decision-making. <u>See</u>

<u>Sears v. Upton</u>, 130 S. Ct. 3259, 3264 (2010) (trial counsel's investigation of

mitigating evidence, which amounted to less than a day, was limited to talking to

witnesses selected by the defendant's mother); <u>Porter v. McCollum</u>, 130 S. Ct.

447, 453 (2009) (trial counsel met only briefly with defendant prior to penalty

phase and neglected to obtain defendant's school, medical, and military records or to interview defendant's family members); Wiggins v. Smith, 539 U.S. 510, 524-26, 534-35 (2003) (trial counsel abandoned, through "inattention," an investigation that would have revealed abuse, alcoholism, molestation, and diminished mental capacity); Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (noting that trial counsel's investigation of mitigating evidence, begun a week before trial, if properly done should have uncovered that defendant endured a "nightmarish childhood," and counsel erroneously believed that state law barred his access to records).

*b) Background information relevant to claim*

During second-stage opening statements, the prosecution outlined for the jury the three aggravating circumstances that it had alleged and would be attempting to prove. The defense team, in its opening statement, acknowledged the jury's first-stage verdicts and stated that they were "not in any way going to suggest to [the jury] that the[] deaths [we]re anything less than awful." Trial Tr., Vol. IX, at 1690. Instead, defense counsel noted, its second-stage "[e]vidence w[ould] really involve three things":

> Number one, the evidence will show you that since May of 1987, Ronnie Lott's life has consisted of incarceration.
> And you'll have an opportunity to hear from people in both the jail system here who have had contact with him, as well as people in the penal system, penitentiary, who have had contact with him, and be able to hear from them the observations that they have made in their contact during these past 15 years with Ronnie Lott.

63

And I anticipate that what you will hear from them, the behavior, the characteristics of Ronnie Lott, are entirely opposite or diametrically opposed to the violence, the horribleness that you've seen in regard to these crimes.

The evidence will be that while in either the county jail or the penal system, Ronnie Lott has not presented himself as a threat or as a danger to anyone, that during his incarceration that he has made a change, that he has done positive things during that time.

Now, that's in month [sic] way to suggest that that in some way makes what you have determined all right, but it's an opportunity for us to show you what other people have seen in regard to Ronnie Lott. That's number one.

Number two. You will have an opportunity to hear from a family member of Ronnie Lott, get to know a little bit about him in that context, and hear what his family's about, and that he is loved and that he is important to those family members, as well.

And then finally, as [the prosecutor] suggested, we will present to you testimony of Jim Fowler, Jim Fowler being the son of Anna Laura Fowler, and we anticipate that he will tell you that it is his opinion, based in this particular case, that the appropriate punishment for Ronnie Lott is something other than the death sentence.

Id. at 1691-92.

The prosecution proceeded to incorporate by reference all of the evidence it presented during the first-stage proceedings. The prosecution also presented victim impact testimony from three witnesses: Mary Elizabeth Templin (a daughter of Fowler), Harold Fowler (a son of Fowler), and Cynthia Houston (Fowler's oldest granddaughter). All three of these witnesses were asked by the prosecution if they had an opinion as to what the appropriate punishment should be for Lott, and all three testified that, in their view, death was the appropriate punishment.

Lott's defense team in turn presented mitigating evidence in the form of

64

testimony from five witnesses. The first of these witnesses, Charles Harris, worked as a tag supervisor for Oklahoma Correctional Industries, and he testified that Lott was a dependable worker who was generally fun to work with and never exhibited any violent behavior. The second and third witnesses, Jason Ledford and Terry Williams, had worked at the Oklahoma County Jail while Lott was confined there awaiting trial, and both testified that they had not experienced any serious problems with Lott's behavior. The fourth witness, Harriet Tingle, was Lott's niece. She testified that Lott was like an older brother to her, that Lott had people in his family who loved and cared for him, and that she would always love Lott, his crimes notwithstanding. The fifth and final witness was Fowler's oldest son, Jim Fowler. He testified that, in his view, the appropriate punishment for Lott was life without parole. The state trial court, citing Oklahoma state law, refused to explain Jim Fowler's reasoning to the jury.

During second-stage closing arguments, the prosecution discussed the three alleged aggravating circumstances and outlined the evidence that was presented in support of each one. The prosecution also commented on Lott's attempt to use his purported family support as a mitigating factor:

> And let me interrupt myself to say when we get to the mitigating circumstances, that mitigator that Ronald Lott has a good and loving family, this is a difficult case, we're supposed to be on opposite sides, but let the State of Oklahoma be clear. We feel nothing but sympathy and respect for that family.
> They did nothing, nothing to contribute to this behavior. On the contrary, they reached out with love and harmony and support.

65

[Lott] has no excuse that his family didn't love and support him. And what he did with that is use it as a base of operations to do things that that family never, never knew about, never did anything about, would have done what they could to stop, if they had known about it. And that's what he did.

Id., Vol. X, at 1798.

Defense counsel focused their closing arguments on Lott's post-crime behavior in prison:

[N]ormally these cases come up right after the crimes and the DA can say, well, we don't know if he can survive in prison without killing somebody. That's why you have to give him death.
We know that's not true [for Lott]. We know for a fact that he can survive in prison and not hurt anybody because he's done it for 15 years.

Id. at 1813-14.

Now, is Ronnie Lott the worst of the worst? Obviously that's what you will have to decide. If we focus only on the offense and no further, we know what that answer would be. But I hope I've conveyed to you that's only part of it. No, Ronnie Lott has demonstrated that he can function in prison without being a threat.

Id. at 1823.

After deliberating, the jury rejected the continuing-threat aggravator alleged by the prosecution, but found the existence of the other two alleged aggravators, i.e., that the murders were especially heinous, atrocious, or cruel, and that the murders were committed for the purpose of avoiding or preventing a lawful arrest or prosecution. The jury in turn fixed Lott's punishment at death for each of the two murders.

66

*c) The OCCA's rejection of this claim*

Lott first presented his ineffective assistance claim to the OCCA in connection with his direct appeal. More specifically, Lott raised the issue in his direct appeal brief, and also filed with the OCCA an application for an evidentiary hearing on the claim. The OCCA rejected Lott's claim and denied his request for an evidentiary hearing. The OCCA's explanation for its denial, though lengthy, bears quoting:

> In his fifteenth assignment of error, Appellant contends he was denied the effective assistance of counsel by counsel's failure to present any evidence regarding Appellant's background in the second stage of trial. Appellant asserts that abundant information was available to defense counsel, but counsel did not investigate the information sufficiently to make it presentable to the jury. Appellant argues much information existed about his background that could have reduced his moral culpability and humanize [sic] him to the jury. Appellant asserts this claim of error is almost exclusively based on facts outside of the appellate record; therefore his claim of error is raised fully in his <u>Application for an Evidentiary on Sixth Amendment Claims</u> filed concurrently with his appellate brief.
>
> Rule 3.11(B)(3)(b), <u>Rules of the Court of Criminal Appeals</u>, 22 O.S.2001, Ch. 18, App. allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to "utilize available evidence which could have been made available during the course of trial . . . .". Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i). <u>See Short</u>, 1999 OK CR 15, ¶ 93, 980 P.2d at 1108.
>
> In order to meet the "clear and convincing" standard set forth above, Appellant must present this Court with evidence, not speculation, second guesses or innuendo. This requirement of setting forth evidence does not include requests for more time to develop

67

and investigate information that was readily available during trial preparation.  Under the provisions of Rule 3.11, an appellant is afforded a procedure to have included in the record for review on appeal evidence which was known by trial counsel but not used or evidence which was available but not discovered by counsel.  It is not a procedure for post-trial discovery.  With these standards in mind, we review Appellant's Application for Evidentiary Hearing on Sixth Amendment Grounds.

. . . .

Appellant . . . contends trial counsel was ineffective for failing to adequately investigate and present mitigating evidence.  He argues trial counsel failed to competently advise him of the meaning and availability of mitigating evidence.  Appellant asserts that trial counsels' failure to consult with him and obtain his consent not to offer evidence of his background in second stage was not the product of deliberate trial strategy, but rather the result of failure to fully investigate mitigation.

In Appellant's Exhibit B, Gretchen Mosley, appellate counsel, admits in her sworn affidavit that a mitigation investigation was conducted in preparation for trial.  She states that investigation included interviewing Appellant (which she did herself) and his family members regarding his childhood, family history, substance abuse, significant relationships and life events, psychological and social development, and life circumstances and events surrounding the time of the crimes.  Ms. Mosley also states intelligence and psychological testing was done, as well as an evaluation by a neuropsychologist for brain damage.  A Risk Assessment was also conducted by licensed psychologist, Dr. Jeanne Russell, Ed.D.

Ms. Mosley states that none of this information was presented to the jury.  She states that when she asked trial counsel why he had not presented any evidence of Appellant's background, trial counsel responded, "that they had 'no way to put it on.'"

Appellant now argues that the mitigation investigation should have put trial counsel on notice that Appellant's background would be a significant mitigating factor at trial, and therefore, trial counsel should have retained an appropriate expert to conduct a social history of Appellant.  Appellant asserts trial counsel should at least have presented the Risk Assessment Report prepared by Dr. Jeanne Russell.

In support of his argument, Appellant presents the affidavit of appellate counsel; a Social History report prepared by Dr. Jeanne

68

Russell, Ed.D., licensed psychologist, at the request of appellate counsel (Appellant's Exhibit C); a Risk Assessment prepared by Dr. Jeanne Russell at the request of trial counsel (Appellant's Exhibit I); a copy of an internal memo from the Oklahoma Indigent Defense System (OIDS) mitigation investigation stating that co-counsel received more information from Appellant about his childhood and family, and that lead counsel decided not to use the additional information, but go with what evidence they had at the time (Appellant's Exhibit D); and affidavits from Sid Conaway and Paula Alfred, capital defense attorneys in the Tulsa County Public Defender's Office, stating in pertinent part, it is the practice of capital attorneys in Oklahoma to retain a mental health/sociology expert to prepare and present to the jurors the client's background (Appellant's Exhibits E and F).

To support his burden of establishing that trial counsels' failings were not the result of reasonable trial strategy, Appellant presents his own affidavit (Appellant's Exhibit A) stating that counsel never discussed with him their strategy of not investigating or presenting mitigation regarding his background; a copy of an OIDS internal memo prepared by trial counsel after Appellant's trial concerning the decision not to impeach state's witness Brian Wraxall (Appellant's Exhibit G); and a copy of an OIDS internal memo (apparently from a mitigation investigator to lead counsel) suggesting a change of counsel to an African–American attorney from Oklahoma County based upon certain concerns of Appellant's family (Appellant's Exhibit H).

Appellant has provided a great deal of information in his Application and accompanying affidavits. However, we find he has failed to set forth sufficient evidence to warrant an evidentiary hearing. The affidavits submitted by Appellant show a substantial mitigation investigation was conducted in this case. However, Appellant finds fault with trial counsels' failure to conduct a further investigation. Appellant asserts trial counsel should have requested "expert forensic mental health assistance to explain the importance of Appellant's experiences to his development and commission of the crimes" and presented this to the jury in the form of a Social History Report. Indeed, in Oral Argument, appellate counsel argued the information contained in the Social History was the only information that could have saved Appellant's life and that trial counsel had an obligation to put that information before the jury. For the reasons discussed below, we find Appellant has failed to show by clear and

69

convincing evidence that trial counsels' failure to present a Social History Report of Appellant to the jury warrants an evidentiary hearing.

As part of the mitigation investigation, a Risk Assessment Report was prepared. In Appellant's Exhibit I, Dr. Russell stated that Appellant was referred by defense counsel for evaluation of his potential risk of future violent behavior. Dr. Russell stated her assessment was based upon interviews with Appellant, jail staff, and OIDS Investigator Leedy; and review of transcripts from preliminary hearings in Appellant's prior convictions; records from the Department of Institutions, Social and Rehabilitative Services (DISRS) and Department of Corrections (DOC), and results of intelligence and psychological tests.

In her assessment, Dr. Russell set forth the reasons for Appellant's incarceration, his family history, education, substance abuse history, psychiatric history, medical history, relationships, employment, and criminal history. Additionally, the assessment contains Dr. Russell's observations on Appellant's behavior and mental status. She stated he is "guarded in his responses to interview questions", but shows "no symptoms of a major mental disorder such as hallucinations or delusions". Also included in the Risk Assessment are Assessment Results and Appellant's aggression history. In the Assessment Results portion of the report, Dr. Russell stated Appellant scored high for the presence of psychopathy, which she explained was "characterized interpersonally by grandiose, egocentric, manipulative, and deviant interactions", and "by a lack of empathy, guilt or remorse". She also stated psychopathy was defined "behaviorally in terms of impulsivity and sensation seeking". Also included in the Assessment Results were Dr. Russell's statements of Appellant's Personality Factors. She stated there was "no evidence of psychotic thinking or other symptoms related to a major mental illness". Instead, "test results indicated Appellant was self-centered or absorbed and may have difficulty in delaying gratification". She said his "behavior vacillated from agreeable to accusatory and this type of behavior often keeps others on edge never knowing if he will react in an obliging or resentful manner". She also stated, "many of his legal difficulties were most likely the product of these attributes coupled with a chronic substance abuse problem. Results further suggest he has not developed internal controls and as a result functions best in a controlled, structured environment such as a prison until such control is developed."

70

As for the Aggression History portion of the report, Dr. Russell noted Appellant's two prior convictions for violent rapes against elderly women. She stated, "he offered few insights into motive behind victim selection". Dr. Russell also stated that a review of DOC records "revealed 11 misconducts over a 10 year time period none of which included physical aggression."

In the Summary section of the Report, Dr. Russell stated that an evaluation of potential risk to others was conducted for the purpose of assessing continuing threat. She stated risk was assessed for both community and prison settings. Dr. Russell noted Appellant had been incarcerated for 14 of his 41 years. She said Appellant reported drinking alcohol on a daily basis since he was 15 years old. He also reported some use of marijuana but denied use of other drugs. Dr. Russell concluded that Appellant's risk to others in the community should be considered high as he lacks internal controls, has access to alcohol, and his acts of aggression have always occurred in the community and involved elderly women. Dr. Russell also concluded that Appellant's risk to others in a prison setting should be considered low based in part on the structure of the prison system. She also stated, "since incarceration for the most part minimizes the defendant's access to alcohol, drugs, weapons and potential victims, the risk for future aggression significantly decreases when placed in a more secure setting".

At the request of appellate counsel, Dr. Russell also conducted a Social History of Appellant. In Appellant's Exhibit C, Dr. Russell explained that a Social History is to assess the impact of both psychological and sociological factors on Appellant's offense. She also stated it differs from the Risk Assessment performed previously as the Social History looks at historical factors to better understand behavior while the risk assessment "focuses on the interaction of the environment and personality traits in assessing the probability for future aggression."

A comparison of the reports show, that but for one exception, the same sources were relied upon for information. The one exception, "interviews with family members and friends", is listed as a resource on the Social History Report but not the Risk Assessment Report. Consequently, Appellant's family history and childhood is set forth in greater detail in the Social History. However, as Appellant and family members were interviewed as part of the mitigation investigation, trial counsel was presumably aware of the information provided by family members. Further, many of the conclusions set

71

forth in the Social History Report are the same as those set forth in the Risk Assessment Report.FN19  While recognizing the different purposes behind the Social History and the Risk Assessment, the two reports in this case contained much of the same information. Therefore, when we consider the information gathered from the mitigation investigation and known to trial counsel, we find Appellant has failed to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to expand his investigation to include a social history of Appellant.

> FN19. In the Risk Assessment, Dr. Russell stated Appellant "tries to present himself in a favorable light which may be due to a combination of denial and lack of self-awareness."  In the Social History she states Appellant "employs denial and repression to deal with psychological pain."  Both the Risk Assessment and Social History note the early onset and long-lasting use of alcohol by Appellant.  Both reports also note the lack of internal controls on Appellant's part.  Both reports conclude that in the absence of any external controls, either the Oklahoma Children's Center where Appellant was admitted as a delinquent child or the adult prison system, combined with the lack of internal personal controls, Appellant engages in a pattern of daily drinking, use of drugs and criminal activity.

Next, we turn to the presentation of mitigation evidence.  Defense counsel presented five witnesses during second stage:  Charles Harris, Tag Supervisor for the Oklahoma Correctional Industries at RBD Connors Correctional Facility, and Jason Ledford and Terry Williams, Detention Officers at the Oklahoma County Jail.  Each of these witnesses testified to Appellant's conduct and behavior while incarcerated.  Harris testified that Appellant was a good worker in the tag facility and has risen to a position where he assisted Harris in overseeing the operation.  Harris described Appellant as dependable, and said if Appellant were sent back to him in the tag facility; he would have no problem working with him.  Harris said he never saw Appellant exhibit any aggressive or violent behavior.  Ledford and Williams both testified that they had not seen any violent behavior or had any problems with Appellant while he was incarcerated in the Oklahoma County Jail.

72

Also presented was Harriett Tingle, Appellant's niece. Ms. Tingle testified she was only eight years younger than Appellant and that he was more like a big brother to her than an uncle. In addition to detailing prior experiences with Appellant, she stated that while Appellant was incarcerated, she stayed in contact with him. Ms. Tingle testified that no matter what sentence Appellant received, she and his family would continue to support him. The final defense witness was Jim Fowler, Mrs. Fowler's son. Mr. Fowler testified generally against the death penalty.

Trial counsel's decision to limit the mitigating evidence to the above witnesses appears to have been reasonable trial strategy. Presenting witnesses who would testify to Appellant being a productive member of prison society was consistent with information contained in the Risk Assessment that the risk of future aggression from Appellant significantly decreased when he was in a secure prison environment.

Further, Ms. Tingle was the only family member who testified although she stated she had been accompanied to trial by an uncle and his girlfriend, her grandmother (Appellant's mother), an aunt and a cousin. There is no indication in the record or in Appellant's Application for Evidentiary Hearing why those relatives did not testify at trial.

Therefore, it comes down to counsel's failure to present evidence of Appellant's life history and the circumstances surrounding the crimes as contained in the Social History. Looking at both the Risk Assessment Report and the Social History Report it was reasonable trial strategy not to put too much of Appellant's life history before the jury. For every witness the defense presents, the State has the opportunity to cross-examine. While Appellant argues that presenting evidence of his life history and an explanation of his conduct in light of his psychological and social development would have enabled the jury to see him as a person and not as a monster, the evidence could have the opposite impact on the jury. Both the Risk Assessment and Social History contain information unflattering to Appellant. Presenting detailed evidence concerning the behavioral impact of Appellant's life history of having no external or internal controls (except when incarcerated) combined with chronic substance abuse "could reasonably be viewed as mitigating to one person and aggravating to another." Murphy, 2002 OK CR 24, ¶ 54, 47 P.3d at 886.

Information contained in the Social History which could arguably

be seen as mitigating evidence consisted of descriptions of Appellant's father as "unloving" and "a strict disciplinarian" who regularly "whipped" his children and spent his salary on his own needs instead of feeding his family; that Appellant was the youngest of 10 children and his mother had a difficult pregnancy with him; the family lived in a small home with only five rooms and no running water; his parent's [sic] separation when he was young and his accompanying his mother, and his young siblings, to live in the city where his mother "worked all the time in an effort to take care of the family and eventually 'kick[ed] him out of the house for getting in trouble'"; Appellant's placement in the Oklahoma Children's Center as a delinquent child when he was 16; and psychological testing which reported Appellant was "anxiously troubled, lonely and socially apprehensive most of the time" and that "he often turns to alcohol to fulfill a number of otherwise difficult to achieve psychological functions".

Dr. Russell stated in part the Social History was to provide a background for understanding why Appellant eventually aggressed against older women in such a violent and abusive way. She concluded that although he had a positive relationship with his mother, her decision to leave his father and move from the country to the city was "the single most devastating event in his life." Dr. Russell also noted a relationship Appellant had with a woman named Donna Burton. Burton apparently gave birth to a daughter during their relationship although the paternity of the child was in question. After the relationship between Burton and Appellant ended, Appellant continued to provide for the child. Dr. Russell noted the relationship ended in 1984 or 1985, about the time the first of the rapes occurred. Dr. Russell claimed the relationship with Burton provided additional insight into how Appellant dealt with abandonment and may have been the catalyst for his aggression.

By contrast, information in the Social History which could be described as not mitigating includes Dr. Russell's statement that Appellant had a very different view of the way he was raised and "glamoriz[ed]" his early years, his description of his relationship with his father as "close", his reported memory lapse concerning his move to the city with his mother and that Appellant's descriptions of his early life was inconsistent with that of other family members and DISRS records. The Social History lists Appellant's seven prior convictions from two different states ranging from conspiracy to sell marijuana to first degree rape and robbery with firearms and that

74

Appellant has been in prison since 1987. Also included in the Social History is information concerning Appellant's alcohol and substance abuse which could be seen in either a mitigating or non-mitigating light. This is a brief, and admittedly incomplete synopsis of the Social History, which Appellant argues defense counsel was ineffective in failing to present.

Having reviewed the information in the Social History, we find presentation of that evidence would not have been helpful to Appellant and might even have been counterproductive. If in fact, Dr. Russell had been put on the witness stand to testify to the Social History, the topic of the Risk Assessment and the information and conclusions therein would have been relevant information for the State to address on cross-examination. In that scenario, the jury would certainly have heard that Appellant was a chronic alcohol and drug abuser, he was self absorbed, lacked empathy, guilt and remorse and without warning exhibited wide mood swings which affected his interaction with others. The jury might also have heard that Appellant's conduct could not be explained or excused due to a major mental illness or psychotic thinking, as there was no evidence he suffered from either condition. Further, Appellant has received 11 misconduct reports while incarcerated the past 10 years. Although none of the incidents included physical aggression, they did include verbal aggression toward staff.[FN20]

> [FN20.] Having compared the Risk Assessment and the Social History, and finding much of the information contained in the two reports to be similar, we take this opportunity to note that when read in their entirety, the two reports paint a much different picture of Appellant. While recognizing the differing purposes behind the two reports, Appellant comes across as a much meaner more violent person in the Risk Assessment than in the Social History. We note this distinction as a way to caution expert witnesses not to attempt to deceive the courts by intentionally leaving out information that could be relevant to a jury's consideration.

Instead of taking the risk that cross-examination could reveal such "negative" information that would harm Appellant's chances for a sentence less than death, counsel chose to focus on more "positive" evidence of Appellant's life in prison. This evidence showed that

75

while Appellant was incarcerated he was not violent or aggressive, that he was a good worker and had proved himself sufficiently responsible to work at making license tags and to oversee other inmates in the tag facility. We find trial counsel's choice to limit the second stage evidence to that showing Appellant was a productive member of prison society and he had family who loved him, while excluding potentially damaging evidence of Appellant's psychological and social development, especially in light of his history of aggression towards elderly women, was reasonable trial strategy well within the range of professional reasonable judgment. In fact, counsel would have been ineffective if the door to the damaging Risk Assessment Report and evidence contained therein had been opened and the State had been able to exploit it to their advantage. The Social History in this case contained the "double edge" the Supreme Court has found sufficient to justify limited investigations. See Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). We find it sufficient to justify a limited presentation of evidence.

Defense counsel in this case consisted of a team of four attorneys well known to this Court to be experienced in both the prosecution and defense of capital cases. Having reviewed the contents of the Social History, trial counsel's response to appellate counsel that the Social History was not presented because there was "no way to put it on" can be interpreted as saying the evidence could not be "safely" presented to the jury, not that it couldn't be put on at all. The record shows a reasoned strategic decision, made after a reasonably thorough investigation, not to present the Social History because it would have opened the floodgates to evidence very harmful to Appellant. Even with the evidence contained in the Social History, the State's evidence in aggravation was great in this case, while the mitigating evidence was much weaker.

Appellate counsel argued at oral argument that negative information about Appellant was already before the jury in that he had been convicted of committing admittedly horrific crimes. Appellate counsel argued that trial counsel had an obligation to present additional facts and psychological factors to explain Appellant's conduct. To the contrary, counsel does not have an obligation to introduce any and all evidence that might conceivably be considered mitigating in the hope that it might outweigh the aggravating evidence and save the defendant's life. Counsel's obligation is to use reasonable professional judgment in making

76

decisions concerning the defendant's case.FN21

> FN21. Further, counsel does not have an obligation to get a waiver from the defendant on the decision not to present certain mitigating evidence. While this Court has held that when a competent defendant intends to completely forego the presentation of any mitigating evidence during second stage, counsel must obtain a knowing waiver to that effect, Wallace v. State, 1997 OK CR 18, ¶ 27, 935 P.2d 366, 376, we have not extended the need for a waiver to a case where some mitigation evidence is offered. Therefore, contrary to Appellant's claim, counsel was not obligated to obtain a written waiver from Appellant concerning the decision to limit presentation of his background in second stage.

This is not to say that counsel is to make all of the decisions in the case. As I stated in my special concurrence to Grant v. State, 2004 OK CR 24, 95 P.3d 178, (Lumpkin, J. special concur), it is the (competent) client's case, not the lawyer's. While, [sic] counsel has the responsibility to advise, inform, and consult with the client, the defendant has the right be [sic] involved in the decision process that will affect his or her life. Id., citing Faretta v. California, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

In the present case, there is no indication that during trial, Appellant disagreed with counsel's decision to limit the presentation of mitigating evidence. Further, the record reflects no question as to Appellant's competency for trial. The record shows that counsel's decision was a strategic choice made after a thorough investigation and within the exercise of reasonable professional judgment. Accordingly, we find presentation of the Social History would not have significantly influenced "the jury's appraisal" of Appellant's moral culpability. Cf. Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 2544, 156 L.Ed.2d 471 (2003) quoting Williams v. Taylor, 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Accordingly, having thoroughly reviewed Appellant's Application and accompanying affidavits, we find he has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to investigate further and utilize the complained-of evidence. We decline to grant Appellant's application for an evidentiary hearing on sixth amendment [sic] grounds.

77

Lott I, 98 P.3d at 351-57 (alterations in original) (footnote and internal paragraph numbers omitted).

*d) The federal district court's analysis of the claim*

Notwithstanding the OCCA's lengthy analysis and rejection of Lott's ineffective assistance claim, the district court in this case concluded that it was bound by our decision in Wilson v. Workman, 577 F.3d 1284 (10th Cir. 2009) (en banc), to review the claim de novo:

> Petitioner's claim was presented to the OCCA through a Rule 3.11 motion because it relied upon matters outside of the record. While thoroughly addressing the non-record evidence, the OCCA reviewed Petitioner's claim within its Rule 3.11 framework and denied Petitioner his requested evidentiary hearing because he "failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to investigate further and utilize the complained-of evidence." Lott, 98 P.3d at 351-57. In Wilson, the Tenth Circuit determined that this analysis of an ineffectiveness claim is not owed AEDPA deference. "This is an explicit application of the Rule 3.11 standard which . . . does not replicate the federal standard and therefore does not constitute an adjudication on the merits as to whether [Petitioner's] non-record evidence could support his Strickland claim. A federal court therefore does not owe deference to the OCCA's rejection of [Petitioner's] ineffectiveness claim." Wilson, 577 F.3d at 1300. Thus, in accordance with Wilson, Petitioner's claim is subject to de novo review.

ROA, Vol. I, Pt. 4, at 765-66 (alterations in original).

Reviewing Lott's claim de novo, the district court concluded first that Lott's trial counsel "conducted a substantial mitigation investigation" and thus "knew [Lott]'s life history" and the result of his mental health evaluations. Id. at

78

779. In turn, the district court concluded that Lott's trial counsel, "fully aware of the difficulties encountered by [Lott] in his life, opted to pursue a different mitigation strategy" that focused on Lott's "extensive history of life in incarceration" and his ability to "be productive and nonviolent" in a prison setting. Id. at 782. Lott's trial counsel also, the district court noted, "presented evidence that [Lott] had a family who loved and supported him, and a sentence recommendation of life without parole from one of the victim's own family members." Id. Considered together, the district court concluded, "[t]his was sound trial strategy." Id. The district court also, out of an abundance of caution, analyzed the prejudice prong of the Strickland test and concluded that Lott had "failed to establish prejudice." Id. at 783.

*e) Which standard of review to apply in this appeal*

The parties disagree on what standard of review we must apply in reviewing Lott's ineffective assistance claim. Lott contends that we, like the district court, should apply a de novo standard of review. In support, Lott cites to Wilson. In Wilson, a majority of this court held, for three essential reasons, that "[a] federal court . . . does not owe deference to the OCCA's rejection of [an] ineffectiveness claim" under the OCCA Rule 3.11 standards. 577 F.3d at 1300. First, the majority expressed concern that the OCCA might not analyze the proffered non-record evidence in every instance in which it denies a motion for an evidentiary hearing under Rule 3.11. Id. at 1290-92. Second, and relatedly, the

79

majority concluded in the cases before it that, because of the summary nature of the OCCA's rulings, the OCCA had not analyzed the petitioners' proffered non-record evidence and had, instead, denied the petitioners' ineffective assistance claims based solely upon the record evidence. Id. at 1290-91 ("In the cases before us, the [OCCA] disposed of mixed questions of law and fact, but did so on a factual record that was, solely as a result of the state procedural rule, incomplete."). Third, the majority held that "[b]ecause [OCCA] Rule 3.11 creates a higher evidentiary burden than the federal [Strickland] standard, [it] cannot [be said] that the OCCA's failure to grant an evidentiary hearing under this standard necessarily constitutes a determination that the defendant could not satisfy the federal standard." Id. at 1299. The district court in this case, considering itself bound by Wilson, afforded no deference to the OCCA's decision in Lott I and instead reviewed Lott's ineffective assistance claim de novo.

Respondent argues on appeal that "[s]ince Wilson was decided, the OCCA has clarified the relationship between the Strickland standard and OCCA Rule 3.11." Aplee. Br. at 66. Specifically, respondent notes that in Simpson v. State, 230 P.3d 888 (Okla. Crim. App. 2010), the OCCA stated as follows:

> In conjunction with [his ineffective assistance of counsel] claim, Appellant has filed a Rule 3.11 motion for an evidentiary hearing on the issue of ineffective assistance of counsel asserting that counsel was ineffective for failing to adequately investigate and identify evidence which could have been made available during the trial. Rule 3.11, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2007). In accordance with the rules of this Court,

80

Appellant has properly submitted with his motion affidavits supporting his allegations of ineffective assistance of counsel. Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2007). As the rules specifically allow Appellant to predicate his claim on allegations "arising from the record or outside the record or a combination of both," id., it is, of course, incumbent upon this Court, to thoroughly review and consider Appellant's application and affidavits along with other attached non-record evidence to determine the merits of Appellant's ineffective assistance of counsel claim. Our rules require us to do so in order to evaluate whether Appellant has provided sufficient information to show this Court by clear and convincing evidence that there is a strong possibility trial counsel was ineffective for failing to utilize or identify the evidence at issue. Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2007). This standard is intended to be less demanding than the test imposed by Strickland and we believe that this intent is realized. Indeed, it is less of a burden to show, even by clear and convincing evidence, merely a strong possibility that counsel was ineffective than to show, by a preponderance of the evidence that counsel's performance actually was deficient and that but for the unprofessional errors, the result of the proceeding would have been different as is required by Strickland. Thus, when we review and grant a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we do not make the adjudication that defense counsel actually was ineffective. We merely find that Appellant has shown a strong possibility that counsel was ineffective and should be afforded further opportunity to present evidence in support of his claim. However, when we review and deny a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we necessarily make the adjudication that Appellant has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in Strickland.

230 P.3d at 905-06. In light of this explanation in Simpson, respondent argues, it is now clear that "Rule 3.11 does not place on defendants a heavier burden to demonstrate ineffectiveness of counsel than Strickland," Aplee. Br. at 67, and we

must therefore apply to the OCCA's decision the more deferential standard of review outlined in § 2254(d)(1). Respondent also argues that, even if we apply a de novo standard of review to the claim, "the factual findings the OCCA made in reviewing the proffered evidence should be given a presumption of correctness" under § 2254(d)(2). Id.

We agree with the respondent. In Simpson, the OCCA made clear that Rule 3.11 obligates it to "thoroughly review and consider [a defendant's Rule 3.11] application and affidavits along with other attached non-record evidence." 230 P.3d at 905. Thus, even in cases, such as Wilson, where the OCCA summarily disposes of a defendant's Rule 3.11 application without discussing the non-record evidence, we can be sure that the OCCA in fact considered the non-record evidence in reaching its decision. Such a conclusion, we note, is entirely consistent with the Supreme Court's repeated admonitions that AEDPA's deferential standards of review "do[] not require that there be an opinion from the state court explaining the state court's reasoning." Harrington v. Richter, 131 S. Ct. 770, 784 (2011). The OCCA's decision in Simpson also clarifies that the interplay of Rule 3.11's "clear and convincing" evidentiary standard and its "strong possibility of ineffectiveness" substantive standard is "intended to be less demanding than the test imposed by Strickland." 230 P.3d at 906. In other words, the OCCA in Simpson has now assured us that "when [it] review[s] and den[ies] a request for an evidentiary hearing on a claim of ineffective assistance

82

under the standard set forth in Rule 3.11, [it] necessarily make[s] the adjudication that Appellant has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in Strickland." Id. Consequently, it is plain to us, as a matter of federal law, that any denial of a request for an evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to OCCA Rule 3.11, including the one made by the OCCA in Lott's direct appeal, operates as an adjudication on the merits of the Strickland claim and is therefore entitled to deference under § 2254(d)(1). Lastly, it is indisputable that we are bound to defer to the OCCA's factual findings (regarding what pretrial investigative steps Lott's trial counsel took) under § 2254(d)(2).

*f) Analysis of the OCCA's decision*

The only aspects of the OCCA's decision that give us some pause are its findings, made in the course of considering the first Strickland prong, that Lott's trial counsel decided as a matter of trial strategy to forego presenting evidence of Lott's social history, and that when Lott's trial counsel stated to Lott's appellate counsel after trial that there was "no way to put [the Social History] on" at trial, they were "saying the evidence could not be 'safely' presented to the jury, not that it couldn't be put on at all." Lott I, 98 P.3d at 356. But those findings, made on the basis of the OCCA's review of the record on direct appeal, must "be presumed to be correct" unless Lott rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). And after conducting our own

83

review of the record in this case, we cannot say that Lott has made such a showing. As the OCCA apparently concluded, the only reasonable inference that can be drawn from the record is that Lott's counsel determined that introduction of Lott's social history would be more detrimental than beneficial, and thus made a strategic decision not to present that evidence.

Even if we were to assume that the OCCA's first-prong analysis was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), we would still be bound to defer to the OCCA's prejudice analysis under Strickland's second prong. In the OCCA's view, although the Social History Report prepared by Dr. Russell contained some potentially mitigating information, it also included information "which could be described as not mitigating," Lott I, 98 P.3d at 355, and that "might even have been counterproductive," id. at 356. The OCCA also noted that, had Dr. Russell testified about the Social History Report, the prosecution would have cross-examined her about "the Risk Assessment and the information and conclusions therein," and that, consequently, the jury "would certainly have heard that [Lott] was a chronic alcohol and drug abuser, . . . was self absorbed, lacked empathy, guilt and remorse and without warning exhibited wide mood swings which affected his interactions with others," his "conduct could not be explained or excused due to a major mental illness or psychotic thinking, as there was no evidence he suffered from either condition," and he "ha[d] received 11

84

misconduct reports while incarcerated [during the] 10 years" prior to trial. Id. Thus, the OCCA concluded, "[e]ven with the evidence contained in the Social History, the State's evidence in aggravation was great in this case, while the mitigating evidence was much weaker." Id. After carefully examining the record on appeal, we cannot quarrel with this conclusion, and we in turn conclude that it is neither contrary to, nor an unreasonable application of, Strickland.

### 6) Admission of improper victim impact evidence

In Proposition Six of his appellate brief, Lott contends that the state trial court's admission of improper victim impact testimony from witness Cynthia Houston, the granddaughter of victim Fowler, resulted in the arbitrary and capricious imposition of the death penalty in violation of the Eighth and Fourteenth Amendments. According to Lott, Houston's testimony "did not meet [Oklahoma's] statutory requirements of admissible victim impact evidence," which limit such testimony to "immediate family members." Aplt. Br. at 101-02 & n.49. In turn, Lott argues, Houston "read a lengthy, poignant statement in which she related several of her grandmother's personal characteristics to the jury," id. at 103, and then proceeded "to testify about the impact her grandmother's death had on her father, her aunt and her uncles," id. at 104. Finally, Lott complains, "Houston concluded her testimony by giving her personal opinion that the appropriate punishment was death." Id. And taken as a whole, Lott argues, the probative value of Houston's testimony was substantially

85

outweighed by its prejudicial effect.

*a) Clearly established Supreme Court precedent*

The Supreme Court's decisions in Payne and Booth v. Maryland, 482 U.S. 496 (1987), provide the clearly established federal law applicable to this claim. In Booth, the Court held "that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible [under the Eighth Amendment] at a capital sentencing hearing." Payne, 501 U.S. at 830 n.2. That holding was overruled by the Court in Payne. Id. at 830 & n.2. "Booth also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." Id. at 830 n.2. Payne did not overrule this portion of Booth. Id. "Thus, it remains constitutionally improper for the family members of a victim to provide characterizations and opinions about the crime, the defendant, and the appropriate sentence during the penalty phase of a capital case." DeRosa v. Workman, 679 F.3d 1196, 1237 (10th Cir. 2012) (internal quotation marks omitted).

*b) The OCCA's rejection of Lott's claim*

On direct appeal, Lott asserted some, but not all, of the arguments he now asserts in this federal habeas appeal. In Proposition X of his direct appeal brief, Lott alleged in a heading that the admission of Houston's testimony violated Oklahoma state law (specifically the Oklahoma statute governing admission of

86

victim impact evidence), and also "resulted in arbitrary and capricious imposition of the death penalty in violation of the Eighth and Fourteenth Amendments." Direct Appeal Br. at 74 (capitalization in original altered). But the body of the argument in support of Proposition X made no further mention of the United States Constitution or any Supreme Court case. Instead, Lott's arguments focused on the admissibility of Houston's testimony under Oklahoma state law. And, although Lott complained generally about Houston having offered her opinion of the appropriate sentence, Lott did not argue that Houston's testimony in that regard violated his constitutional rights.

In rejecting Lott's direct appeal, the OCCA addressed both Lott's state law arguments and his general assertion that the admission of Houston's testimony violated his constitutional rights, but did not specifically address whether the admission of Houston's sentencing recommendation was constitutionally improper[9]:

> In his tenth assignment of error, Appellant contends the trial court erred in admitting the victim impact testimony of Cynthia Houston. Ms. Houston was the granddaughter of Mrs. Fowler. Appellant argues her testimony was inadmissible for the following reasons: 1) the testimony contained irrelevant evidence about the impact of the victim's death on non-immediate family members; 2) she testified as a family designee when family members had already testified; and 3)

[9] Although we question whether, in light of this procedural history, Lott has adequately exhausted his challenge to the admission of Houston's sentencing recommendation, the State has expressly acknowledged that this constitutional claim was exhausted and, thus, has waived any argument on that basis. See 28 U.S.C. § 2254(c).

87

the testimony was highly prejudicial.

Prior to trial, Appellant objected to Ms. Houston's testimony on the same grounds now raised on appeal. In a Cargle[FN11] hearing during the second stage of trial, the court ruled that Ms. Houston did not qualify under the statute as a member of the victim's immediate family but could testify if designated as a family representative. The trial court limited her testimony to the effects of Mrs. Fowler's death on her father, her aunt, and her uncles.

> FN11. Cargle v. State, 1995 OK CR 77, 909 P.2d 806, cert. denied, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996), habeas corpus granted and remanded for a new trial on other grounds, Cargle v. Mullin, 317 F.3d 1196 ([10th Cir.] 2003).

During the presentation of the victim impact evidence, Mrs. Fowler's son and daughter, Harold Fowler and Mary Templin, testified. Ms. Houston, having been designated the family representative by Harold Fowler, was the third and final victim impact witness. Reading from a prepared statement, Ms. Houston described how her grandmother was greatly loved by the family, that someone in the family visited her on a daily basis, and that her kitchen was a comfortable place for the family to congregate. Ms. Houston also testified to her grandmother's abilities in sewing and gardening. She described the "great impact" her grandmother's loss had on her father and his siblings. Ms. Houston concluded her testimony by stating her personal opinion that the appropriate punishment was death. No defense objections were raised during Ms. Houston's testimony therefore we review only for plain error. Murphy v. State, 2002 OK CR 24, ¶ 42, 47 P.3d at 884.[FN12]

> FN12. The trial court's ruling on the admissibility of the victim impact evidence was similar to a ruling on a motion in limine, advisory only and not conclusive. See Short v. State, 1999 OK CR 15, ¶ 65, 980 P.2d 1081,1102–03, cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (1999). To properly preserve the issue for appellate review, an objection must raised [sic] at the time the testimony is given. Id. Appellant's failure to object to Ms. Houston's testimony at the time it was offered, waives all but plain error.

Victim impact evidence is constitutionally acceptable unless "it is so unduly prejudicial that it renders the trial fundamentally unfair . . . ." Payne v. Tennessee, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720, 735 (1991). In Cargle, 909 P.2d at 827–28, this Court addressed at length victim impact evidence as addressed by the Supreme Court and by our state statutes. Since that time we have had numerous occasions to revisit the statutory guidelines that control the content and use of victim impact evidence. However, Appellant's second challenge to Ms. Houston's testimony has not been specifically addressed by this Court in previous cases. The resolution of this challenge determines whether it is necessary to review his other objections to the testimony.

Victim impact evidence is set forth in 22 O.S.2001, §§ 984, 984.1.FN13 The manner in which victim impact evidence is to be presented and used at trial is set forth in § 984.1. This section provides in pertinent part, "each victim, or members of the immediate family of each victim or person designated by the victim or by family members of the victim, may present a written victim impact statement or appear personally at the sentence proceeding. . . . ." (emphasis added). This language limits the persons who may give victim impact evidence to three types of people: 1) the victim; 2) members of the victim's immediate family; or 3) a person designated by the victim or the victim's family. The listing in the disjunctive of the persons who may give victim impact evidence indicates the Legislature's intent to make these three categories of victim impact witnesses mutually exclusive. This restrictive view of who may give victim impact testimony is consistent with the limitations placed on victim impact evidence by the Legislature and by this Court. See Cargle, 1995 OK CR 77, ¶ 75, 909 P.2d at 828 ("victim impact evidence is intended to provide a quick glimpse of a victim's characteristics and the effect of the victim's death on survivors.")

FN13. 22 O.S.2001, § 984 provides in pertinent part:

1. "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding

89

the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence;

2. "Members of the immediate family" means the spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim; (emphasis added).

22 O.S.2001, § 984.1(A) provides:

A. Each victim, or members of the immediate family of each victim or person designated by the victim or by family members of the victim, may present a written victim impact statement or appear personally at the sentence proceeding and present the statements orally. Provided, however, if a victim or any member of the immediate family or person designated by the victim or by family members of a victim wishes to appear personally, such person shall have the absolute right to do so. (emphasis added).

The victim is usually the best person to testify to the effects of a crime perpetrated against him or her. In a homicide case when the victim cannot speak, family members are usually in the best position to give victim impact evidence. However, if family members choose not to take the witness stand or for any reason are unable to testify, they may designate another person to speak for them. The purpose behind a family designee is to give a voice to family members unable to testify in court. It was not intended to provide an opportunity for those family members not listed in the statute and other interested persons to give victim impact testimony.

Applying the statutory language to the present case, as Mrs. Fowler's son and daughter testified as members of her immediate family, it was not necessary to have a family designee or representative testify.FN14 Therefore, it was error to allow Ms. Houston to testify as a family designee.FN15

FN14. In Williams v. State, 2001 OK CR 9, ¶ 66, 22 P.3d 702, 719, cert. denied, 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002), this Court cited 22 O.S.Supp.1992, § 984.1 and stated that the Legislature had provided that any family member who wished to appear personally [to give victim impact evidence] shall have the absolute right to do so. This statement was in

response to the appellant's argument that this Court should adopt a rule limiting the number of victim impact witnesses to one. This Court refused to adopt such a rule finding no statutory authorization for setting such limits on the number of witnesses. In that regard, the ruling in the present case is not intended to be a limitation of the number of victim impact witnesses. As long as a witness properly qualifies under the statute to give victim impact evidence, the number of witnesses the jury will hear is left to the sound discretion of the trial court.

FN15. Further, as a granddaughter Ms. Houston does not fall under the statutory definition of immediate family permitted to give victim impact evidence. This Court has not extended the statutory definition to include persons related to victims in ways other than those designated by the Legislature. Hanson v. State, 2003 OK CR 12, ¶ 28, 72 P.3d 40.

However, having reviewed her testimony, we find nothing which "improperly weighted the scales" in the trial.FN16 Ms. Houston's testimony was brief and did not focus on the emotional aspects of the victim's death. Certain portions were cumulative to the testimony of her father and aunt.

FN16. See Payne, 501 U.S. at 822, 111 S.Ct. at 2606–07;

Further, the jury was properly instructed, pursuant to OUJI–CR (2d) 9–45 on the use of victim impact evidence. Appellant had been convicted of raping and killing two elderly, defenseless women in their homes. Evidence of the aggravating circumstances was overwhelming and evidence of the aggravating circumstances clearly outweighs the mitigation evidence. Reviewing the entire record, we cannot say admission of Ms. Houston's testimony caused the verdict to be the result of an unreasonable emotional response. Accordingly, we find no plain error, and this assignment of error is denied.

Lott I, 98 P.3d at 346-48 (second alteration in original) (internal paragraph numbers removed).

*c) Analysis of the OCCA's decision*

In this appeal, Lott argues that, "in determining whether [federal] habeas relief is warranted on the basis of <u>Payne</u>, the question under 28 U.S.C. § 2254(d) is whether the OCCA properly applied <u>Chapman[ v. California</u>, 386 U.S. 18 (1967),]" in concluding that the admission of Houston's testimony was harmless beyond a reasonable doubt. Aplt. Br. at 102-03. And, according to Lott, the OCCA's harmless error analysis was flawed because "[t]he poignant testimony [Houston] presented regarding her grandmother, plus her recommendation of death – the third such recommendation made to the jurors – had a substantial and injurious effect on the jury's verdict." <u>Id.</u> at 103 (footnote omitted).

As an initial matter, we reject Lott's suggestion that the question at issue "is whether the OCCA properly applied <u>Chapman</u>." In <u>Fry v. Pliler</u>, 551 U.S. 112 (2007), the Supreme Court made clear "that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in <u>Brecht[ v. Abrahamson</u>, 507 U.S. 619, 637 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in <u>Chapman</u> . . . ." 551 U.S. at 121-22. Thus, if we determine that the admission of Houston's victim impact testimony was constitutional error, then we must assess the prejudicial impact of that error under the <u>Brecht</u> test, rather than "the more liberal AEDPA/<u>Chapman</u> standard

92

which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable." Id. at 119-20.

We thus turn to the question of whether the admission of Houston's testimony violated Lott's constitutional rights. As we have noted, the OCCA concluded that it was a violation of Oklahoma state law for the trial court to allow Houston to testify as a family designee. Consequently, as we read its decision, the OCCA did not reach the question of whether the admission of Houston's testimony also violated Lott's constitutional rights. We therefore must review that issue de novo.

It is clear to us that Lott's constitutional rights were violated by the admission of Houston's testimony opining about the appropriate sentence for Lott. See DeRosa, 679 F.3d at 1237. As we have noted, that type of victim impact testimony remains inadmissible under Booth. Id. The remainder of Houston's testimony, however, was not violative of Lott's constitutional rights. Specifically, the remainder of Houston's testimony was aimed at reminding the jury that Fowler "[wa]s an individual whose death represent[ed] a unique loss to society and in particular to h[er] family." Payne, 501 U.S. at 825 (internal quotation marks omitted). Although its admission may have violated Oklahoma state law, it did not violate the Eighth Amendment. See id. at 827 ("We thus hold that if the State chooses to permit the admission of victim impact evidence . . . , the Eighth Amendment erects no per se bar."). Thus, we must assess whether the

93

admission of Houston's testimony regarding the appropriate sentence for Lott had a "substantial and injurious effect" on the outcome of the second-stage proceedings.

As the OCCA noted in conducting its own plain-error analysis, the entirety of Houston's testimony was brief (comprising a total of six trial transcript pages), and the constitutionally offending testimony was comprised of four words: "My opinion is death," which were stated in response to the prosecutor's question, "Do you have an opinion as to what the appropriate punishment in this case is?" Given the overwhelming evidence of Lott's guilt of the two rapes/murders, as well as his admitted guilt of the two subsequent rapes, and the cruel and brutal nature of the crimes, we conclude that the admission of Houston's offending testimony did not have a substantial and injurious effect on the jury's sentencing determination. In other words, we can say, "with fair assurance, after pondering all that happened [at Lott's trial] without stripping the erroneous action from the whole, that the [jury's sentencing verdict] was not substantially swayed" by Houston's offending testimony.[10] Kotteakos v. United States, 328 U.S. 750, 765 (1946).

---

[10] We note, in passing, that the other victim impact witnesses, Mary Elizabeth Templin and Harold Fowler, also testified, in response to questioning by the prosecution, that they believed that death was the appropriate punishment for Lott's crimes. Lott, however, has never objected to the admission of this testimony. Out of an abundance of caution, we did not consider that testimony in assessing the prejudicial impact of Houston's testimony.

94

***7) Sufficiency of evidence—avoid arrest or prosecution aggravator***

In Proposition Seven of his appellate brief, Lott contends that insufficient evidence was presented at his trial to support the jury's second-stage findings that the two murders were committed in order to avoid arrest or prosecution. According to Lott, "[t]he cause of death [in each case] was asphyxiation," "[t]here was no evidence that the homicides were separate and distinct from the rapes, and the deaths of the[] two elderly victims likely occurred without [his] intent to kill either of the victims." Aplt. Br. at 107. Lott further argues that "[t]he evidence showed that in . . . three of the rapes [he] used a pillow to subdue the three victims," and, "[l]ikely, the asphyxiation of . . . Fowler and . . . Cutler occurred during the rapes as they were subdued." Id. at 107-08.

*a) Clearly established Supreme Court precedent*

Lott points to Jackson v. Virginia, 443 U.S. 307 (1979), and Lewis v. Jeffers, 497 U.S. 764 (1990), as providing the clearly established law applicable to this claim. In Jackson, the Supreme Court addressed "[t]he question . . . [of] what standard is to be applied in a federal habeas corpus proceeding when the claim is made that a person has been convicted in a state court upon insufficient evidence." 443 U.S. at 309. And it "h[e]ld that in a challenge to a state criminal conviction brought under . . . § 2254[,] . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

95

<u>Id.</u> at 324.  In <u>Lewis</u>, the Court held that this same standard of review applies "to federal habeas review of a state court's finding of aggravating circumstances." 497 U.S. at 782.  Under that standard, "[a] state court's finding of an aggravating circumstance in a particular case . . . is arbitrary or capricious if and only if no reasonable sentencer could have so concluded."  <u>Id.</u> at 783.

*b) The OCCA's rejection of Lott's claim*

Lott asserted these same arguments on direct appeal.[11]  The OCCA rejected them, stating as follows:

> In his twelfth assignment of error, Appellant challenges the evidence supporting the finding that the murders were committed for the purpose of avoiding lawful arrest or prosecution.  To support a finding of this aggravating circumstance the State must prove the defendant killed in order to avoid arrest or prosecution.  <u>Williams</u>, 2001 OK CR 9, ¶ 83, 22 P.3d at 723; <u>Mollett v. State</u>, 1997 OK CR 28, ¶ 49, 939 P.2d 1, 13, <u>cert. denied</u>, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998).
> The defendant's intent is critical to this proof and can be inferred from circumstantial evidence.  <u>Williams</u>, at ¶ 83, 22 P.3d at 723. Furthermore, there must be a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest or prosecution. <u>Id.</u>  When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed.  <u>Hain v. State</u>, 1996 OK CR 26, ¶ 62, 919 P.2d 1130, 1146, <u>cert. denied</u>, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996).  <u>See also</u> <u>Abshier</u>, 2001 OK CR 13, ¶¶ 156–157, 28 P.3d 579, 610, <u>cert. denied</u>, 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002).  In making this determination, this

---

[11]  In doing so, Lott also argued that neither Miller's statements to police, nor Detective McKenna's testimony, were admissible and thus could not be considered in assessing the sufficiency of the evidence to support the aggravator. Direct Appeal Br. at 85-86.

Court should view the evidence in the light most favorable to the State. Hain, at ¶ 62, 919 P.2d at 1146.

In the present case, the evidence showed Appellant subdued and raped both victims. While Appellant and the victims did not know one another, there is no indication Appellant attempted to hide his identity during the rape. That the victims could have identified their assailant if left alive is sufficient to support the conclusion that the victims were killed in order to prevent their identification of Appellant and his subsequent arrest and prosecution. See Wackerly v. State, 2000 OK CR 15, ¶ 43, 12 P.3d 1, 14–15, cert. denied, 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001); Mollett, 1997 OK CR 28, ¶ 49, 939 at 13, 939 P.2d 1.

Citing Barnett v. State, 1993 OK CR 26, 853 P.2d 226, Appellant further contends the rape was not a separate predicate crime arguing, "it is likely . . . the victims died during the rape as Appellant tried to subdue them, rather than Appellant completing the rapes and killing the victim before he left so that they would not tell." In Barnett, this Court found the "assault and battery was not separate and distinct from the murder itself, but rather was part of a continuing transaction which culminated in the death of the victim." 1993 OK CR 26, ¶ 30, 853 P.2d at 233–34.

The evidence in the present case shows the victims' deaths were not the result of the rape. Both victims died as a result of asphyxiation. The evidence at both crime scenes revealed numerous bruises on the victims' arms indicating they had been bound by the hands. Further, both victims suffered fractured ribs that Appellant concedes was consistent with the perpetrator having sat on the victim. However, the existence of pillows, and their condition, at both scenes supports the inference Appellant sat on the victims after the completion of the rape and smothered them. Reviewing this evidence in the light most favorable to the State, a rational jury could have found beyond a reasonable doubt the rapes were distinct and separate crimes from the murders, and that Appellant killed the victims in order to avoid lawful arrest or prosecution.

Lott I, 98 P.3d at 348-49 (footnote and internal paragraph numbers omitted).[12]

---

[12] We note that although the OCCA initially identified the "proper test" for assessing Lott's sufficiency-of-the-evidence challenge as the "any competent evidence" test, it ultimately framed its conclusion in terms of the standard

(continued...)

*c) Analysis of the OCCA's decision*

Lott now argues that the OCCA's analysis was unreasonable in four respects. To begin with, he notes that the prosecution's "other crimes" evidence established that "[n]either . . . Hoster nor . . . Marshall[, the surviving victims of the rapes,] knew . . . Lott, yet neither of them was killed." Aplt. Br. at 109. Consequently, he asserts, it was unreasonable for the OCCA to conclude "that because [he] did not hide his identity during the rapes [of Fowler and Cutler] he therefore killed the[m] to prevent them from identifying him . . . ." Id. Second, Lott argues that, contrary to the conclusion reached by the OCCA, his "supposed use of a pillow to subdue his victims does not prove an intent to kill the victims" because "during three of the rapes the victims were subdued with pillows, yet only . . . Cutler and . . . Fowler were killed." Id. Third, Lott argues that "the OCCA's reliance on the injuries to the victims as a basis for finding that the rapes were separate from the crimes [wa]s likewise unreasonable" because the evidence presented at trial established that all four victims, including the two survivors, sustained injuries to their head, face, and arms. Id. Finally, Lott argues that "[t]he OCCA's finding that [he] sat on the victims 'after the completion of the rape and smothered them' . . . is in direct conflict with th[e] [OCCA's] findings

---

[12](...continued)
outlined by the Supreme Court in Jackson. Lott does not argue that the OCCA applied the wrong legal standard or for application of de novo review due to the OCCA's reference to the "any competent evidence" standard.

98

regarding [his] claim concerning the admission of 'other evidence' crimes . . . ." Id. at 109-10 (quoting Lott I, 98 P.3d at 348). "In resolving that claim," he asserts, "the OCCA found that 'a pillow was placed over the faces of three of the victims during the assault.'" Id. at 110 (quoting Lott I, 98 P.3d at 335). Thus, he argues, "[t]he OCCA unreasonably twisted the facts in order to justify the admissibility of the other crimes evidence and to validate the finding of the 'avoiding arrest' aggravator," and its "findings regarding these two issues cannot be reconciled." Id.

Addressing those arguments in reverse order, it is true that the OCCA, in discussing the admissibility of the other-crimes evidence and outlining the similarities between the four crimes, noted that "a pillow was placed over the faces of three of the victims during the assault . . . ." Lott I, 98 P.3d at 335. It is also true that the OCCA in turn, in addressing Lott's challenge to the sufficiency of the evidence supporting the "killed to avoid arrest or prosecution" aggravator, concluded that the evidence, viewed in the light most favorable to the prosecution, "support[ed] the inference [that Lott] sat on [Fowler and Cutler] after the completion of the rape[s] and smothered them." Id. at 348. Contrary to Lott's assertions, however, these two separate determinations are not necessarily inconsistent. By accurately noting that a pillow was employed in three of the cases (the evidence was undisputed on this point), the OCCA was merely describing one (among many) similarities in how the crimes were carried out.

99

And its language describing those similarities was not intended in any way to suggest that the employment of the pillows occurred during any of the three rapes. Rather, the OCCA carefully and appropriately used the word "assault" to describe the overall attacks in the three cases (since the victims in all three cases were not only raped, but severely beaten). In contrast, when it discussed the sufficiency of the evidence to support the aggravator, it employed different language, noting that Lott "sat on [Fowler and Cutler] after the completion of the rape[s] and smothered them." Id. (emphasis added).

Lott's other three arguments, all of which focus on the similarities between the four crimes, can be disposed of based upon the testimony of prosecution witness Gerald McKenna. McKenna, the Oklahoma City Police Department inspector who specialized in sex crimes, testified that, in his opinion, the murders of Fowler and Cutler were committed to eliminate them as witnesses, and not because Lott received sexual gratification from those killings. McKenna also testified that, in his opinion, the person who committed the third crime, i.e., the rape/assault of Marshall (the other crime that involved the use of a pillow over the victim's face), realized that if he killed Marshall, he would effectively alert the police, who had already arrested and charged Miller with the murders of Fowler and Cutler, that the killer was still on the loose. Thus, despite the fact that there were significant similarities between the four crimes, the specific evidence introduced regarding the Fowler and Cutler crimes, particularly when

100

viewed in the light most favorable to the prosecution, would clearly have allowed the jury to infer that the perpetrator intended to kill those women in order to avoid arrest or prosecution for the rapes/assaults.

In the end, we conclude that the OCCA reasonably described both the evidence relevant to the aggravator and the reasonable inferences that a jury could have drawn from that evidence. Thus, we in turn conclude that the OCCA's determination that the evidence was constitutionally sufficient to support the jury's finding of the aggravator was neither contrary to, nor an unreasonable application of, clearly established federal law.

## 8) Cumulative error

In Proposition Eight of his appellate brief, Lott contends that the cumulative effect of all of the constitutional errors in his case warrants federal habeas relief. Lott raised a similar issue in his direct appeal, asserting that "the aggregate impact of the errors in []his case warrant[ed] reversal of his convictions and at the very least modification of his death sentence." Lott I, 98 P.3d at 357. The OCCA denied that assignment of error, stating: "[h]aving found no errors warranting reversal or modification, we find relief is not warranted upon a cumulative error argument." Id. Because, however, the OCCA did not identify the constitutional error arising from the introduction of the improper victim evidence, we will not grant deference to its decision and instead review Lott's cumulative error claim de novo. See Hooks v. Workman, 689 F.3d 1148, 1194

101

(10th Cir. 2012).

We recently "note[d] that there is a split in the circuits on whether the need to conduct a cumulative-error analysis is clearly established federal law under § 2254(d)(1)." Id. at 1194 n.24. Our "body of precedent may very well signal where our court has come down on this issue—viz., that cumulative-error analysis is clearly established law." Id. But we have no need to resolve that question here, as we have identified only a single constitutional error.

"In the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Alverson v. Workman, 595 F.3d 1142, 1162 (10th Cir. 2010) (internal quotation marks and brackets omitted). "[A]s the term 'cumulative' suggests, . . . we undertake a cumulative-error analysis only if there are at least two errors." Hooks, 689 F.3d at 1194-95.

The only clear constitutional error that occurred at Lott's trial was the admission of the improper victim impact evidence. However, that error, standing alone, does not implicate cumulative-error analysis. And even if we were to assume the existence of additional constitutional errors, we cannot say, having exhaustively examined the record on appeal, that Lott's trial was "so infected . . .

with unfairness as to make the resulting conviction[s] [or sentences] a denial of due process." Id. at 1188 (internal quotation marks omitted).

AFFIRMED.